**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**LANCASTER VILLAGE CONSUMER HOUSING COOPERATIVE f/k/a LANCASTER VILLAGE COOPERATIVE,** a domestic non-profit corporation

Plaintiff,

v. Case No. 2:26-cv-

**DINO DEMARE**, an individual, Hon.

Defendant,

**ESTHER THOMAS,** an individual,

Defendant.

---

**<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, Lancaster Village Consumer Housing Cooperative f/k/a Lancaster Village Cooperative ("Lancaster"), by and through its attorneys, Apex Law, PLC, for its Complaint against Defendant, Dino DeMare ("DeMare"), states as follows:

**INTRODUCTION AND RELEVANT PROCEDURAL BACKGROUND**

1. This is a civil action against Defendant Dino DeMare ("DeMare") and Esther Tomas ("Thomas") collectively "Defendants", individually, arising out of Defendant's personal participation in, direction of, and commission of fraud, breach of fiduciary duty, negligence, civil conspiracy, tortious interference, and racketeering activity.

2. Such activities were carried out by Defendants under color of their positions as the principal, president, agent, and/or directing minds of P.P.S of Michigan, LLC. ("PPS"), the former property management company for Lancaster.

3. Lancaster has separately submitted its claims against PPS to arbitration before the American Arbitration Association, as required by the arbitration provision contained in the Housing Management Agreement between Lancaster and PPS (the "Agreement"). **Exhibit 1.**

4. Defendants, however, are not a party to the Agreement in his individual capacity and has not personally agreed to arbitrate any dispute with Lancaster.

5. Accordingly, Lancaster brings this separate civil action against Defendants, individually, in this Court for his own personal tortious, fraudulent, and racketeering conduct, independent of Lancaster's claims against PPS in arbitration.

6. As set forth below, Defendants personally directed, orchestrated, and participated in a scheme to steer Lancaster's federally subsidized construction, renovation, and repair work to preferred, unqualified, unlicensed and/or non-competitive contractors.

7. Defendants, including contractors referenced in this Complaint, specifically D.A. Home Improvement, Inc. ("DA") and its successor-in-interest, D&G Construction Services ("DG"), owned and operated by Andrew Green ("Green"), coordinated to submit rigged and/or fictitious competitive bids.

8. Defendants further concealed known health and safety hazards (including toxic mold) from Lancaster's Board of Directors and members.

9. Upon information and belief, Defendants personally fabricated, signed, or caused to be signed and submitted to Lancaster a bid document purporting to have been submitted by a bidding contractor, Stathakis, Inc. ("Stathakis"), without Stathakis's knowledge, authorization, or consent, for the purpose of creating the false appearance of a competitive bid process and ensuring that DA (Defendant's preferred contractor) would be, and was, awarded underlying work at the Lancaster property. **Exhibit 2**.

10. Upon information and belief, Defendants have engaged, and continues to engage, in this same pattern and practice—working in concert with DA and/or its principals to solicit, fabricate, or otherwise manipulate competitive bidding processes on construction and renovation projects located in states other than Michigan.

## PARTIES

11. Plaintiff Lancaster is a domestic nonprofit corporation, with its principal offices located in the City of Pontiac, Oakland County, Michigan.

12. Lancaster is a HUD-licensed residential housing cooperative consisting of 287 townhome units, the operation of which is subsidized in part with federally insured, taxpayer funds.

13. Upon information and belief, Defendant DeMare is an individual who, at all times relevant to this Complaint, resided in and/or maintained his principal place of business in Oakland County, Michigan, within this District, and who, upon information and belief, remains domiciled in the State of Michigan.

14. Upon information and belief, Defendant Thomas is an individual who, at all times relevant to this Complaint, resided in and/or maintained his principal place of business in Oakland County, Michigan, within this District, and who, upon information and belief, remains domiciled in the State of Michigan.

15. At all relevant times, Defendants were the president, principal, sole or controlling owner, and/or directing officers of PPS, a Michigan corporation with its principal office at 30300 Telegraph Road, Suite 205, Bingham Farms, Oakland County, Michigan, and personally directed, authorized, participated in, and ratified each of the acts and omissions of PPS described in this Complaint.

## JURISDICTION AND VENUE

16. This Court has original subject-matter jurisdiction of this Complaint pursuant to 28 U.S.C. §1331 and 18 U.S.C. §1964(c), because Count I arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961–1968 ("RICO").

17. This Court has supplemental jurisdiction over Lancaster's remaining state-law claims against DeMare pursuant to 28 U.S.C. §1367(a), because those claims are so related to the federal RICO claims that they form part of the same case or controversy and derive from a common nucleus of operative fact.

18. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims asserted herein occurred in Oakland County, Michigan, within the Eastern District of Michigan, Southern Division, and because, upon information and belief, DeMare resides within this District.

19. This Court also has personal jurisdiction over Defendants because they resides in, and/or has continuously and systematically conducted business and committed the tortious and unlawful acts alleged herein within, the State of Michigan and this District.

## FACTUAL ALLEGATIONS

### *The Agreement and Defendant's Role as PPS's Directing Principal*

20. On or about June 18, 2014, Lancaster and PPS entered into the Agreement, which was later supplemented by an Addendum dated on or about February 6, 2017. **Exhibit 1**.

21. Under the Agreement, PPS was engaged as Lancaster's property manager and agent, responsible for, among other things, the administration of contracts and construction work performed on Lancaster's behalf.

22. Throughout the term of the Agreement, Defendants personally served as PPS's president and principal, and personally acted as Lancaster's day-to-day property manager, routinely communicating directly with Lancaster's Board of Directors, members, contractors, residents, and counsel in that capacity.

23. Defendants undertook PPS's duty to seal and direct bids from at least three (3) contractors or suppliers for work items which PPS estimated would cost Five Thousand Dollars ($5,000.00) or more. **Exhibit 1**, at page 12.

24. Defendants personally exercised control over PPS's decisions regarding which contractors would be hired to perform work at Lancaster's property.

25. Defendants personally exercised control over PPS's decisions regarding the manner in which bids were solicited and evaluated.

26. Defendants personally exercised control over PPS's decisions regarding whether and when Lancaster's Board was informed of material developments.

27. Defendants personally exercised control over PPS's decisions regarding the disbursement of Lancaster's funds.

28. By virtue of their personal, direct dealings with Lancaster's Board of Directors and members over an eight-year period, Defendants personally occupied a position of influence and trust with respect to Lancaster, and Lancaster accordingly placed its trust, confidence, and reliance directly in Defendants.

***The Fabricated and Rigged Bidding Scheme***

29. In 2020, Lancaster's Board of Directors and PPS secured government funding for, and initiated, a large-scale renovation project encompassing exterior concrete work as well as interior kitchen, bathroom, notably 2nd story bathroom flooring and toilet renovations, electrical renovations to individual units, and asphalt paving replacement. (the "Project").

30. Competitive bidding was required for all Project work.

31. In or about May of 2020, Defendants personally issued a bid proposal (the "RFP") with a submission deadline of May 11, 2020. **Exhibit 3**.

32. Before the deadline, DA submitted a bid for the Project, as did Andrew Green on behalf of Hout Construction.

33. Green's bid on behalf of Hout was significantly higher than DA's bid, and DA was awarded the work.

34. DeMare personally presented to Lancaster's Board a third, purportedly competing bid attributed to Stathakis.

35. Stathakis's CEO, Chris Stathakis, has since sworn by affidavit that Stathakis never submitted a bid for the Project and never authorized anyone to submit a bid on Stathakis's behalf. **Exhibit 2**.

36. Upon information and belief, Defendants personally fabricated, signed, and/or caused to be fabricated and signed the purported Stathakis bid, without that contractor's knowledge or consent, for the purpose of creating the false appearance that Lancaster's Board was reviewing multiple, independent, competitive bids, when in truth Defendants had already determined that the work would go to his preferred contractor, DA.

37. Upon information and belief, Defendants instructed Green to submit an artificially high bid on behalf of Hout Construction in connection with the Project's ostensibly competitive bidding process, for the purpose of ensuring that DA's bid would appear to be the lowest and most competitive, and that DA would be awarded the work.

38. This pattern of obtaining non-competitive, inflated, or entirely fictitious bids in order to award work to a predetermined, preferred contractor was not an isolated occurrence. DA has completed similar renovation projects in many Cooperative managed by Defendants.

39. A materially identical pattern occurred in connection with asphalt paving work at Lancaster that Defendants awarded to Asphalt Specialists Inc. ("ASI") in or around 2020.

40. ASI was federally indicted and convicted in 2024 for participating in kickback and bid-rigging schemes.

41. As with the DA bid, ASI's bid was suspiciously close to the budgeted price (miraculously within $1,200 of the budget price for Lancaster's asphalt work).

42. Further, a bid lower than ASI's was submitted prior to the deadline, but summarily ignored for unexplained reasons.

43. Defendants thereafter approved substantial change orders that caused the final contract price to exceed even the highest original bid.

44. The foregoing is consistent with a scheme in which a favored contractor is awarded work at an artificially low bid price and then permitted to recoup, and exceed, that discount through subsequent change orders, with an undisclosed benefit flowing back to the individual who steered the work.

45. Upon information and belief, Defendants worked, and continue to work, in concert with DA and/or its principals to engage in substantially similar bid-rigging schemes in connection with construction and renovation projects located in states other than Michigan.

***The DA-to-DG Substitution and Concealment of an Unlicensed Contractor***

46. Consistent with the rigged bid award, on or about July 2, 2020, Lancaster entered into a contract with DA for renovation of kitchens, bathrooms, and electrical systems, which

incorporated the RFP by reference and required, among other things, a performance bond, a payment bond, code-compliant work, permits, and a five-year workmanship warranty.

47. DA never provided the required bonds, never coordinated inspections, and never pulled the required permits, and Defendants, despite personally administering the contract on Lancaster's behalf, never required DA to comply with these critical contractual obligations.

48. On July 30, 2021, DA was sold to DG, an entity owned and operated by Green—the same individual who had submitted the artificially high, losing Hout Construction bid at DeMare's instruction—without Lancaster's knowledge or approval.

49. DA's president, David Adamczyk, walked off the Project the following day, July 31, 2021, the same day the Project was contractually required to be completed.

50. DG, an unlicensed residential builder, thereafter continued performing the work under DA's name, without Lancaster's knowledge or authorization, billing under DA's name and pursuing collection of amounts owed under DA's contract, in a scheme to conceal DG's unlicensed status and fraudulently induce Lancaster to pay for work performed by an unlicensed contractor.

51. In depositions it was discovered that in July, 2021 DeMare, Andrew Green, and Dave Adamczyk, held a meeting DeMare to discuss the work, upon information and belief, this meeting confirmed their fraudulent concealment scheme.

52. Upon information and belief, DeMare was personally aware of, facilitated, and benefitted from the foregoing concealment scheme.

53. As a direct result of substandard work performed by DA and/or DG—including the failure to properly seal toilet flanges during bathroom renovations—Lancaster experienced

widespread and severe mold contamination throughout numerous units, resulting in documented damages of at least $414,983.44.

54. This $414,983.44 figure understates the true scope of the damage because Defendants purposefully failed to document many instances of damage out of fear of liability or as a cost saving measure to DA and/or DG.

55. Defendants were personally informed, on multiple specific occasions, of mold and water-intrusion complaints from Lancaster members (including complaints from residents in units 1171 Amos and 1232 Amos).

56. Defendants had personally acknowledged the foregoing complaints in writing, including in a January 2022 email in which DeMare admitted that a particular unit's toilet "has been leaking ever since the installation":


1-28-2022
Spoke with Joe @ Advance Abatement.
Jordon
- Seal on toilet wasn't done correctly and the [illegible] leaked everytime they Flushed.

57. Defendants knew of the mold issues and allowed those issues to persist well beyond a reasonable time for repair.

58. As evidence of that conclusion, member, Teonia Jackson, complained about mold in her unit, and that complaint went unaddressed for a significant amount of time.

59. On August 13, 2020, Lancaster's site manager sent an email to DeMare, indicating mold was alleged to be present, requesting mold remediation, and further stating that PPS failed to address the problem.

60. On August 19, 2020, DeMare acknowledged receipt of the mold allegations.

61. On or about September 28, 2021, Lancaster member Toketia Bushell at unit 1171 Amos reported "water leaking into cabinets from bathroom – maggots cabinets and toilet[.]"

62. On or about October 4, 2021, DeMare was made aware that visible mold was also discovered in the kitchen and bathroom in Toketia Bushell's unit.

63. On or around January 27, 2022, air testing at another unit belonging to Teonia Jackson, 1232 Amos, showed "very high" mold presence in the air.

64. Ms. Jackson also complained that mold reoccurred in the kitchen area of her unit.

65. On or about January 28, 2022, Toketia Bushell reported her toilet was leaking, contributing to mold and contaminating her personal possessions, rendering them unusable.

66. On or about February 2, 2022, DeMare acknowledged Ms. Bushell's concerns about the leaking toilet and mold.

67. DeMare also acknowledged that the original complaint regarding the toilet occurred in December 2020, was raised again in September 2021, and remained ongoing and unresolved as of February 2022.

68. On or about February 3, 2022, Ms. Bushell contacted the City of Pontiac complaining about PPS's failure to fix the mold situation and alleging the unit is unsanitary.

69. DeMare either ignored the foregoing reports of mold or failed to take any interim or permanent action to remediate or abate same.

70. Thereafter, Lancaster sent a letter of directive to DeMare on the mold issue and the failure to timely remediate it dated March 2, 2022. **Exhibit 4**.

71. That directive confirms that "no one" was responding to a member's "numerous requests for answers and assistance" with respect to the mold issues; that "members . . . made

complaints to the City of Pontiac for additional assistance in making their units habitable and registering formal complaints about the existence of mold in the units"; and that this was "a terrible situation" that "should not have reached this level." *Id.*

72. On March 22, 2022, Michigan Multifamily Asset Managers ("MMAM") sent a resident inquiry to PPS indicating that a member at Lancaster "alleges she has been waiting for 3-years to have the kitchen cabinets and floor replaced. The floor is yellow and rotting near the door.. . . [She] further alleges she has followed up with management on several occasions and continues to receive no response or update. MMAM requests that you review these concerns and provide a written response including supporting documentation no late[sic] than 03/24/2022." **Exhibit 5**.

73. PPS did not provide the requested response to MMAM by March 24, 2022.

74. Instead, on April 4, 2022, well after the March 24, 2022 deadline set by MMAM, DeMare sent an email to Lancaster's attorney stating, "[w]e are in need of a floor replacement as a result of a MMAM inquiry. I know we are not supposed to spend money without prior authorization so we are requesting this authorization." **Exhibit 6**.

75. This was consistent with a prior directive by the Lancaster Board, that no further payments be made to DA or D&G unless approved by the Board.

76. Notwithstanding this actual, personal knowledge, Defendants failed to cause the hazard to be timely investigated, abated, or remediated, leaving members to live with mold and, in at least one instance, maggots in bathroom cabinetry for many months.

77. Additionally, Defendants approved unauthorized expenditures and signed significant checks to contractors without prior review or approval from Lancaster's Board.

78. Despite all the confirmation of leaks, mold, complaints to state agencies, DeMare failed to put DA on written notice of a breach of contract, notice of default, or otherwise, all to the detriment of Lancaster, and which significantly reduced Lancaster's ability to seek appropriate compensation from DA, DG, subcontractors of either or both DA and Lancaster's

79. Indeed Board of Directors was not consulted regarding certain contractor payments until October 2021.

***Defendants's Personal Self-Dealing, Coercion, and Concealment***

80. On or about February 14, 2022, DeMare walked out of a Lancaster Board of Directors meeting, personally declaring that he was finished with Lancaster, would not attend further Board meetings, and that a mutual release between PPS and Lancaster would be forthcoming.

81. DeMare thereafter refused to attend, or cause PPS's staff to attend, any further Board meetings.

82. Notwithstanding his stated intention to abandon Lancaster, Defendants personally continued to cause PPS to withdraw its full monthly management fee directly from Lancaster's accounts (including for March and April 2022) while refusing to perform the corresponding management duties, and while causing PPS to issue invoices to Lancaster captioned "LIQUIDATING DAMAGES PAYMENT," ultimately totaling $18,250.02, notwithstanding PPS's own material non-performance.

83. On March 23, 2022, DeMare personally emailed Lancaster's counsel demanding that "the Contractors that I brought in [be] paid in full," and warning that Lancaster would "be getting pressure from the mortgage company as well since one lien has already been filed." **Exhibit 7**.

84. As DeMare had "predicted" (and, upon information and belief, coerced or encouraged) Redford Cement Co. and DA thereafter filed construction liens against Lancaster's property, precipitating a default notice from Lancaster's mortgage lender.

85. In an April 5, 2022 email to Lancaster's counsel, DeMare personally conditioned his execution of a mutual release between PPS and Lancaster upon satisfaction of the claims of DA and Redford Cement Co. **Exhibit 8**.

86. DeMare had no rational or fiduciary basis to leverage execution of the mutual release upon payment to the very contractors whose defective, unbonded, unpermitted work he had allowed onto Lancaster's property in the first instance.

87. As a direct and proximate result of the fraudulent, tortious, and racketeering conduct described above, Lancaster has suffered damages including, without limitation:

(i) at least $349,912.71 in costs associated with the necessary replacement of disintegrating precast concrete steps installed under a contract secured without competitive bidding;

(ii) at least $414,983.44 in documented mold-related remediation and repair costs;

(iii) at least $132,651.35 in indemnification obligations arising from construction liens filed by Redford, DA, and DG;

(iv) $18,250.02 in wrongfully assessed liquidated-damages invoices; and

(v) right to disgorgement of management fees paid to DeMare during periods of material non-performance, which Lancaster estimates to be at least $2,000,000.00.

## <u>COUNT I – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)</u>

88. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

89. Defendants, PPS, DA, DG, ASI, and Green constituted an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §1961(4), which functioned as a continuing unit for the common purpose of directing Lancaster's federally-subsidized construction and renovation work to DA and/or DG through rigged, fabricated, or non-competitive bidding, concealing the resulting substandard work and unlicensed contracting from Lancaster, and extracting undisclosed benefits, payments, or kickbacks for Defendants' personal benefit. This is also a violation of 18 U.S.C. §1962(d).

90. The Enterprise engaged in and affected interstate commerce, including through the use of interstate mail and wire communications, the receipt of federally insured HUD funds, and, upon information and belief, the extension of substantially similar bid-rigging schemes to construction projects located outside the State of Michigan.

91. Defendants ran his property-management company by steering owners' capital work to a captive set of contractors, and Lancaster is one of the properties where he did it.

92. Defendatns conducted or participated, directly in the conduct of the Enterprise's affairs through a pattern of racketeering activity, in violation of 18 U.S.C. §1962(c), consisting of numerous related predicate acts occurring over a period of years, including, without limitation:

a. Repeated acts of wire fraud, in violation of 18 U.S.C. §1343, including the transmission by email and other electronic means of false representations regarding the competitiveness of the Project bidding process, the fabricated Stathakis bid, PPS's administration of DA's and DG's work, and Lancaster's compliance with HUD requirements.

b. Repeated acts of mail fraud, in violation of 18 U.S.C. §1341, including the mailing of invoices, correspondence, and other documents in furtherance of the fraudulent bidding and kickback scheme and falsifying documents submitted to HUD to gain HUD approval for the release of funds.

93. Each of these predicate acts was related to the others by virtue of their common purpose, common participants, common methods, and common victim, and together constituted a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5), posing a threat of continued criminal activity given the multi-year duration of the scheme as to Lancaster and, upon information and belief, its extension to projects in other states.[1]

94. As a direct and proximate result of Defendants' violation of 18 U.S.C. §1962(c), Lancaster has suffered injury to its business and property, including the damages described above, in an amount to be proven at trial.

**COUNT II – COMMON LAW FRAUD**

95. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

96. Defendants personally made material representations of fact to Lancaster, including, without limitation:

a. representations that the Project bidding process was competitive and that a bid had been genuinely submitted by Stathakis;

b. that DA and DG were properly performing and were qualified and authorized to perform work on Lancaster's property;

[1] DeMare's company advertises that it manages over five thousand units across three states.

c. and that Defendants and PPS were properly administering Lancaster's construction contracts and addressing known health hazards.

97. The foregoing representations were false.

98. Defendants knew these representations were false when made, or made them recklessly, without knowledge of their truth and as a positive assertion.

99. Defendants made these representations with the intention that Lancaster act upon them, including by approving the award of Project work to DA, by paying PPS's management fees, and by refraining from independently investigating the bidding process and the qualifications of DA and DG.

100. Lancaster reasonably relied on Defendants' false representations.

101. As a direct and proximate result of its reliance on Defendants' false representations, Lancaster has suffered substantial economic losses, including those described above.

**COUNT III – BREACH OF FIDUCIARY DUTY**

102. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

103. By virtue of Defendatns' eight-year course of personal, direct dealing with Lancaster's Board of Directors and members as Lancaster's property manager, and his position of influence and control over decisions materially affecting Lancaster's property, finances, and contractual relationships, Defendants' personally owed, and assumed, fiduciary duties to Lancaster independent of any duties owed by PPS as a corporate entity.

104. Lancaster placed its trust and confidence directly in Defendants, and Defendants accepted and exercised control over matters within the scope of that trust, including the solicitation and evaluation of contractor bids, the administration of construction contracts, and

communications with Lancaster's Board regarding the status of Project work and known health hazards.

105. Without limitation, Defendants breached their fiduciary duties to Lancaster by fabricating or causing the fabrication of a fraudulent competing bid.

106. Defendants breached their fiduciary duties to Lancaster by steering Project work to DA in exchange for undisclosed personal benefit.

107. Defendants breached his fiduciary duties to Lancaster by concealing DA's and DG's failure to obtain required bonds and permits

108. Defendants breached their fiduciary duties by not issuing a Notice of Default or filing a Claim of Warranty against DA and/or DG to protect Lancaster for the construction failures that led to the loss of hundreds of thousands of dollars in mitigation and restoration services, and legal fees to prosecute claims against DA, DG, their subcontractors, and Redford.

109. Defendants breached their fiduciary duties to Lancaster by concealing DG's unlicensed status.

110. Defendants breached their fiduciary duties to Lancaster by failing to disclose or act upon known mold and health-hazard complaints.

111. Defendants breached their fiduciary duties to Lancaster by leveraging Lancaster's vulnerability to contractor liens to extract concessions benefiting Defendants' preferred contractors rather than Lancaster.

112. Defendants' breaches of fiduciary duty were undertaken in Defendants' own self-interest and in conflict with Lancaster's interests.

113. As a direct and proximate result of Defendants' breaches of fiduciary duty, Lancaster has suffered damages in an amount to be proven at trial.

## COUNT IV – NEGLIGENCE / GROSS NEGLIGENCE

114. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

115. Defendants, utilizing their complete control over PPS, personally undertook to investigate, address, and remediate health and safety hazards (including mold, water intrusion, and related conditions) reported to him directly by Lancaster's Board and members.

116. Having voluntarily undertaken this duty, Defendants' owed Lancaster and its members a duty of reasonable care in following through on his personal representations that such hazards would be investigated and remediated.

117. Defendants' breached that duty by failing to timely or adequately investigate, remediate, or cause the remediation of known mold and water-intrusion conditions, including specific conditions of which Defendants had actual, personal knowledge and which he personally acknowledged in writing.

118. Defendants conduct, including his personal awareness of ongoing mold conditions affecting member health and safety over a period of many months and his failure to act, constituted negligence and, upon information and belief, gross negligence evincing a substantial lack of concern for whether injury would result.

119. As a direct and proximate result of Defendants negligent and/or grossly negligent conduct, Lancaster suffered damages, including increased remediation costs occasioned by delay, in an amount to be proven at trial.

## COUNT V – CIVIL CONSPIRACY

120. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

121. Defendants conspired with DA, DG, ASI, and/or Green to accomplish an unlawful purpose, and/or to accomplish a lawful purpose by unlawful means to defraud Lancaster through a rigged and fabricated competitive bidding process.

122. Defendants conspired with DA, DG, and/or Green to conceal DG's unlicensed status and DA's and DG's failure to obtain required bonds and permits.

123. Defendants conspired with DA and Redford to cause DA and Redford to file Construction liens against Lancaster.

124. Defendants conspired with DA, DG, and/or Green to extract undisclosed benefits and kickbacks at Lancaster's expense for his and/or their personal gain.

125. In furtherance of this conspiracy, Defendants committed overt acts, including personally fabricating or causing the fabrication of the Stathakis bid, instructing Green to submit an artificially inflated competing bid, and concealing DA's and DG's deficiencies and unlicensed status from Lancaster's Board, and purposely ignored a competitive bid for asphalt paving services which was submitted before the announced deadline, all to the detriment of Lancaster.

126. Upon information and belief, this conspiracy between Defendants and DA and/or its principals extends to substantially similar bid-rigging schemes on construction projects located in states other than Michigan.

127. As a direct and proximate result of the conspiracy, Lancaster has suffered damages in an amount to be proven at trial.

## <u>COUNT VI – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS OR EXPECTANCIES</u>

128. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

129. Lancaster had valid business relationships and expectancies with various contractors and service providers, including its lawn maintenance and exterminator service providers, of which Defendants aware.

130. Defendants personally and intentionally interfered with those business relationships and expectancies without justification.

131. Defendants unilaterally directed the termination of Lancaster's landscaping and exterminator service providers without Lancaster's prior notice or approval.

132. Defendatns coerced and encouraged Redford, DA, and other contractors to file construction liens against Lancaster's property as leverage to extract payment for his own, and DeMare's preferred contractors', financial benefit.

133. Defendants interference was intentional, improper, and undertaken for DeMare's own benefit and to Lancaster's detriment.

134. As a direct and proximate result of Defendants tortious interference, Lancaster suffered substantial economic injury, including a default notice from its mortgage lender and increased costs of remediation and replacement services.

## COUNT VII – UNJUST ENRICHMENT

135. Lancaster incorporates each of the preceding paragraphs by reference as if fully set forth herein.

136. Upon information and belief, Defendants personally received undisclosed benefits, payments, and/or kickbacks from DA, DG, ASI, and/or other contractors in exchange for steering Lancaster's work to those contractors without genuine competitive bidding.

137. Defendants receipt and retention of these undisclosed benefits, at Lancaster's expense and to Lancaster's detriment, is inequitable and unjust.

138. Defendants received the benefit of payments from Lancaster in exchange for managing the Lancaster's property including timely addressing resident issues such as mold and water intrusions.

139. Defendants was unjustly enriched by these payments because Defendants intentionally, recklessly, or negligently failed to either timely or entirely address issues as mold and water intrusion.

140. Lancaster conferred a benefit upon Defendants, in the form of the value of the work and fees improperly diverted through the rigged bidding scheme, which Defendants has retained under circumstances that would make it inequitable for him to do so.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lancaster Village Consumer Housing Cooperative f/k/a Lancaster Village Cooperative respectfully requests that this Court enter judgment against Defendant Dino DeMare on Counts I through VII of this Complaint, and award the following relief:

a. General, compensatory, and consequential damages in an amount to be proven at trial, but in not less than $2,000,000.00;

b. Treble damages pursuant to 18 U.S.C. § 1964(c);

c. Lancaster's reasonable attorneys' fees and costs of suit, pursuant to 18 U.S.C. § 1964(c);

d. Exemplary damages as permitted under Michigan law in light of the reprehensible and self-interested nature of Defendants' conduct;

e. Disgorgement of all profits, fees, benefits, or kickbacks personally received by Defendants as a result of the conduct alleged herein;

f. Pre-judgment and post-judgment interest as permitted by law; and

g. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Lancaster demands a trial by jury on all issues so triable.

Respectfully submitted,

**APEX LAW**

Dated: August 20, 2026

/s/ *Tyler P. Phillips*
By: Yousef M. Farraj
Tyler P. Phillips (P78280)
Attorneys for Lancaster Village
32900 Five Mile Road
Livonia, MI 48154
Telephone: (734) 418-3686
yfarraj@apexgrouplaw.com
tphillips@apexgrouplaw.com

# Exhibit 1

# HOUSING MANAGEMENT AGREEMENT

This HOUSING MANAGEMENT AGREEMENT made this 18th day of June, 2014 between **Lancaster Village Cooperative, Inc. a Michigan** (nonprofit) Corporation, (hereinafter referred to as "Owner"), of 633 Palmer Drive, Pontiac, Michigan 48342 and **P.P.S. of Michigan, L.L.C.** a Michigan Limited Liability Corporation, (hereinafter referred to as "Agent") of 30300 Telegraph Road, Suite # 205, Bingham Farms, Michigan 48025.

## I. APPOINTMENT AND ACCEPTANCE:

The Owner appoints the Agent, subject to the terms [herein stated in this contract], for the management of the property described in Section II of this Agreement, and the Agent accepts the appointment, subject to the terms and conditions herein set forth.

## II. DESCRIPTION OF PROPERTY:

The property, (hereinafter referred to as the "Development"), to be managed by the Agent under this Agreement, is a housing cooperative development consisting of land, buildings and other improvements which consist of **287 dwelling units**, located in the **City of Pontiac**, in the **County of Oakland, in the State of Michigan**. The Development is to be operated at all times as a non-profit multi-family development, designed to promote cooperative housing.

## III. DEFINITIONS AS USED IN THIS AGREEMENT:

(A) **Owner** - means **Lancaster Village Cooperative, Inc.** (being represented by its elected and/or appointed Board of Directors.)

(B) **Agent** - means the company offering its management services pursuant to this Contract, to-wit: **P. P. S. of Michigan, L.L.C.**, its agents, servants, and employees.

(C) **Parties** -means collectively, the Owner and Agent

(D) **HUD** – means U. S. Department of Housing and Urban Development

(E) **Secretary** – means the Secretary of the United States Department of Housing and Urban Development.

(F) **Mortgage** - is an instrument of agreement between the Owner, as mortgagor, and the Mortgagee(s) as hereinafter defined, creating a lien on the Development as security for the payment of debt.

(G) **Mortgagee** - means any holder of a Mortgage(s) and Mortgage Note(s) covering all or a portion of the development.

(H) **Contract** - means this instrument.

(I) **Plan** - means the Management Plan, which may be attached hereto as Exhibit "A" and incorporated herein by reference.

(J) **Member/Tenant** - means an occupant who holds a Membership interest in the Owner.

(K) **Membership** - means the evidence of shares or interest in the entity referred to as Owner.

(L) **Development** - means the building and land owned by Owner.

## IV. MANAGEMENT PLAN:

At any time after the signing of this Contract, both Parties will complete, and there shall be attached hereto as Exhibit "A" and incorporated herein by reference a copy of the Management Plan for the Development, which Plan shall provide a comprehensive and detailed description of the policies and procedures to be followed in the management of the Development. The Agent will comply with all applicable provisions of the Plan, regardless of whether specific references are made hereto in any particular provision. Further, the Plan, unlike the Contract, may require revision from time to time in order to meet changing needs of the Owner, or coordination of policies from time to time adopted by the Owner. Accordingly, following the initial Plan, the Plan may be revised, amended, or adjusted as the Owner deems necessary; provided, however that any such adjustment, revision, or amendment which creates or eliminates expense shall be made by mutual agreement of the parties; and, if agreement is not achieved, then this Section shall be subject to the provisions for arbitration hereinafter set forth so as to adjust the management fees. The Plan shall be prepared in a formal up-to-date form subsequent to this Agreement under mutual endeavor of the Owner and Agent; however, it is agreed that this Contract shall nonetheless be binding upon the Parties hereto even if the Plan is not finalized or prepared. It is expressly understood that the terms of this Agreement supersede any terms contained in the Management Plan, which are contradictory to or inconsistent with this Agreement.

## V. MARKETING:

The Agent will oversee the on-site staff's marketing activities (which shall be prescribed in the Management Plan) subject to such directions as shall be given by resolution of the Owner's Board of Directors (from time to time). Subject to the Owner's allocations, advertising expenses will be paid out of the General Operating Account as Development expenses.

## VI. MEMBERSHIP SALES:

The Agent will oversee the on-site staff in the resale of Memberships for all unoccupied dwelling units as well as rental of other rental facilities in the Development, subject to such activities of the Owner. Unless otherwise directed by the Owner, the following shall apply:

(A) The Agent will oversee the on-site staff in taking Applications for Membership; however, the Owner shall have the sole authority to approve or disapprove Applications for Membership unless the Owner's Board of Directors delegates such duty to the Agent or Membership Committee. If an

application is rejected, the applicant will be advised of the reason for the rejection and shall be kept on file for a minimum of three (3) years. A current list of prospective Members will be maintained at all times. All such record keeping shall be maintained on site unless otherwise directed by resolution of the Owner's Board of Directors. The selection polices and procedures must meet the guidelines of the fair housing laws.

(B) The Agent will oversee the on-site staff in showing the premises to prospective Members as the need arises and good business judgment dictates.

(C) The Agent will oversee the on-site staff in the preparation of all Occupancy Agreements, and the Agent or specified on-site staff will execute the same on behalf of the Owner as delegated by the Owner. Preparation shall include: 1) full completion of membership application and the receipt of funds involved, 2) obtaining the credit report of applicant, 3) obtaining the criminal background checks, and, 4) landlord/tenant history of applicant. The terms of all Occupancy Agreements will comply with the pertinent provisions of the Regulatory, Use and/or IRP Agreements, the Owner's By-Laws, the lawful directives of the Secretary and applicable State law. Any change in any provision of the presently utilized Occupancy Agreements will be in a form approved by the Owner, and the Secretary; however, individual Occupancy Agreements need not be submitted for the approval of the Owners or the Secretary.

(D) The Agent will oversee the on-site staff in counseling all prospective Members regarding eligibility for housing charges which are less than HUD's fair-market charges or equivalent, and Agent will oversee the on-site staff in preparing and verifying eligibility, certification, and re-certification in accordance with the Use Agreement and the lawful directives of the Secretary.

(1) The Agent in respect to re-certifications shall exercise due diligence in obtaining all income verification information on members whose legal occupancy is in doubt.

(2) The Agent will enforce all HUD income verification rules and regulations on those members who fail to verify, provide, or cooperate with the recertification procedures.

(E) Before a prospective applicant takes occupancy, (membership), the Agent shall review with the prospective member, all policies, rules, and regulations.

(F) The Agent will, to the extent requested by the Owner, negotiate commercial leases and concession agreements. No such contract may be made by the Agent, which binds the Owner, unless the Owner, following a formal motion of the Owner's Board of Directors, lawfully approves such contract in writing.

(G) The Agent will oversee the on-site staff in collecting, depositing, and disbursing Membership Fees in accordance with the terms of each Member Occupancy Agreement and the Owner's By-Laws. The amount of each Membership Fee will be specified by the Owner, and in accordance with the By-Laws.

## VII. COLLECTION OF HOUSING CHARGES AND OTHER RECEIPTS:

The Agent will oversee the on-site staff in collecting, when due, all housing charges or other accounts receivable on the Owner's account in connection with the management and operation of the Development. Such receipts will be deposited in an account, separate from all other accounts and funds, with a bank whose deposits are insured by the Federal Deposit Insurance Corporation or similar acceptable Insurance approved by the Federal Government. This account will be designated of record as **Lancaster Village Cooperative, Inc., General Operating Account**. All accounts involving the Owner's monies shall be deposited in such form as to require signatory of lawful representatives of the Owners and the Agent.

## VIII. ENFORCEMENT OF OCCUPANCY AGREEMENTS:

(A) The Agent will oversee the on-site staff in securing full compliance by each Member and with the terms of his/her Occupancy Agreement or Lease. Voluntary compliance will be emphasized in order to avoid involuntary termination of Memberships to the maximum extent consistent with sound management of the Development. Nonetheless, and subject to the pertinent procedures prescribe in the Plan, if any, the Owners may lawfully terminate any Membership when, in the Owner's judgment, sufficient cause for such termination occurs under the terms of the Occupancy Agreement, the Owner's By-Laws, or Articles of Incorporation, policies, rules and regulations. Agent will, when applicable, make referrals to community agencies in cases of financial hardship or other applicable circumstances.

(B) It is expressly confirmed by the Agent and Owner that critical concern must be given to the elimination of criminal activities such as drugs and gangs and that therefore members are to be held accountable for the activities of their family members, guests, and invitees. Such cause shall include, but is not limited to, non-payment of carrying charges or rent, non-compliance with the Zero-tolerance Drug Policy as adopted by the Owner's Board of Directors, upon notification of appropriate Law Enforcement Agency, legal counsel and/or Prosecuting Attorney. The on-site staff and Agent are authorized to consult with legal counsel to be designated by the Owner to bring actions for eviction and to execute notices to vacate and judicial pleadings incident to such actions. The on-site staff and Agent will follow such instructions as the Owner or Owner's attorney may prescribe for the conduct of any such actions. Attorney's fees and other necessary costs incurred in connection with such violations will be paid out of the General Operating Account as Development

expenses, or considered part of the retainer cost as determined by the Owner and Owner's attorney.

## IX. MAINTENANCE AND REPAIR:

The Agent will oversee the on-site staff in causing the Development to be maintained and repaired in accordance with good business judgment, the Plan and local codes, and in a condition at all times acceptable to the Owner and the Secretary, including but not limited to, cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary, subject to any limitations imposed by the Owner. Incident thereto, the following provisions will apply:

(A) Special attention will be given to preventative maintenance, and, to the greatest extent feasible, the services of regular maintenance employees will be utilized.

(B) At any time after the signing of the signing of this Contract (instrument), the Agent and the Owner's Board of Directors will develop, and implement a Preventative Maintenance Plan that will address all aspects of the maintenance of the property at acceptable maintenance standards as prescribed by HUD.

(C) The Agent, upon the Owner's written approval, will oversee the on-site staff in contracting with qualified independent contractors for the maintenance and repair of items beyond the capability of regular maintenance employees or the skill of the employees presently working for the Agent or Owner, as the case may be. In such event, no contract may be made by the Agent, which binds the Owner unless the Owner lawfully approves such contract in writing in accordance to the provisions of this Contract.

(D) The Agent shall oversee the on-site staff in systematically and promptly receiving and investigating all service requests from Members and lawful occupants, and take such action thereon as may be necessary, and keep legible and accurate records of the same. Emergency requests will be received and serviced by the maintenance staff on a twenty-four (24) hour basis, and shall be described and designated in the Management Plan. Complaints of a serious nature will be promptly reported in writing to the Owner's Board of Directors, with each director receiving a copy.

(E) At the Owner's expense, the Agent will purchase material, equipment, tools, appliances, supplies, and services necessary for the proper maintenance and repair of the Development, subject to Owner's approval, Paragraph XII below, and the approved budget. Agent will provide a review with the Owner's Board of Directors all expense reports, which will be presented on a monthly basis.

(F) Notwithstanding anything to the contrary herein contained, the prior approval of the Owner's Board of Directors will be required for any expenditure which exceeds Two Thousand ($2,000.00) Dollars in any one instance for labor, materials, or otherwise, in connection with the maintenance and repair of the Development, except for recurring expenses within the limits of the Owner's Operating Budget or for emergency repairs involving manifest danger to persons or property, or for such expenditures as may be required to avoid suspension of any necessary service to the Development, in which event, the Agent will inform the Owner by promptly notifying the Owner's elected Board of Directors, with a copy being sent to each Director of such fact.

(G) It is in the Owner's best interest that any financial resources devoted to maintenance be used in the most productive manner possible. It is the Owner's expectation that the Agent will cause all required maintenance and repair work to be performed promptly and diligently and in a quality manner. Therefore, in each fiscal year, the Owner, in conjunction with the Agent, will establish appropriate line items in its annual budget devoted to maintenance.

## X. UTILITIES AND SERVICES:

In accordance with the Plan and the Owner's Operating Budget, the Agent, upon the Owner approval, will arrange for water, electricity, sewage and trash disposal, vermin extermination, telephone, and other services.

## XI. EMPLOYEES:

(A) The Plan shall prescribe the number, qualifications, and duties of the personnel to be regularly employed in the management of the Development, including a site manager, bookkeepers, clerical employees, maintenance staff, and other staff employees. All such on-site personnel will be the employees of the Agent, and will be hired, paid, supervised and discharged through the Agent subject to the following conditions:

(1.) As may be more particularly described in the Plan, the Site Manager will have duties of the type usually associated with her position. These will include the responsibility for the daily on-site operations of the Development and the supervision of the on-site staff. The Site Manager will report directly to the Agent's Property Manager or other officers of the Agent and will interact with the Owner's Board of Directors as prescribed in the Management Plan.

(2.) The compensation of the on site personnel including the Site Manager, bookkeepers, clerical employees, maintenance staff, and other staff employees shall be subject to the Owner's Board of Director's approval (in the budgetary process), provided minimum wage standards are met.

(3.) The Owner shall reimburse the Agent for compensation (including fringe benefits) payable to all on-site employees and all local, state, and federal tax assessments (including but not limited to social security taxes, unemployment insurance, single business tax), worker's compensation insurance, health insurance, life and disability insurance, dental and vision insurance, third party administration cost and retirement plan contributions incident to the employment of such personnel. Such reimbursement will be paid out of the general operating account and will be treated as an Owner's expense.

(4.) Compensation (including fringe benefits) payable to the on-site staff, such as the Site Manager, plus all local, state, and federal taxes and assessments incident to the employment of such personnel, will be borne solely by the Development and will not be paid out of the Agent's fee. The rental value of any dwelling unit furnished rent-free to staff and the cost of additional training to any staff member will be treated as a cost to the Development. The general parameter for wage/salary levels will be established annually in the operating budget approved by the Owner's Board of Directors. Management shall consult the Owner's Board of Directors if a personnel action will result in exceeding the approved budgeted amount.

(5.) All full-time employees shall be subject to drug screening as a pre-condition of employment.

(6.) The Agent will immediately inform the President of the Board of Directors whenever the Agent hires a new employee, gives an employee a notice of his/her termination of employment, or receives a notice of resignation from an employee. Any additional costs due to an increase in the total number of employees must be provided for in the annual budget approved by the U.S. Department of Housing and Urban Development.

(B) <u>Property Manager.</u>

(1) The Agent will provide a Property Manager who is acceptable to the Owner pursuant to paragraph XII herein. The Property Manager or other representative of the Agent will at the development to oversee the management of the property on a periodic basis. Further, Property Manager shall attend all monthly board meetings, annual meetings, and any other meetings as requested by the Board of Directors of the Owner.

(2) It is agreed that any person assigned as Property Manager will be the Agent's primary responsible employee for the

Development. It is also acknowledged that the Owner, through its Board of Directors, may disapprove of the Property Manager assigned.

(3) The Owner will give any new Property Manager assigned a sixty day (60) day probationary period before indicating any disapproval unless emergency circumstances dictate an earlier disapproval. After any written notice of disapproval, the Agent shall have Thirty (30) days to assign a new Property Manager, who shall then undergo like probationary period.

(4) Failure to provide a Property Manager suitable to the Owner after two (2) consecutive attempts shall give the Owner the right to declare this Contract terminated on a 30-day notice unless the Agent sends a principal of the Agent to assume the duties of the Property Manager.

(5) A principal is defined as a Shareholder, Officer or member of the Agent's Board of Directors.

(6) The Property Manager's compensation shall be at the Agent's expense and shall operate as directed by the Management Plan.

(C) <u>Site Manager.</u>

(1) The Owner shall have the right to meet and interview any person proposed to become the Site Manager, prior to their hiring. The Owner retains the right to reject the proposed Site Manager however the Owner agrees not to unreasonably withhold approval.

(2) The Site Manager shall be assigned to **Lancaster Village Cooperative** as a full time employee, and he/she shall be supervised by the Agent according to the Management Plan. Also, the Site Manager may be provided on-site housing, and, at the sole discretion of the Owner's Board of Directors, the Site Manager may or may not be approved to attend training, seminars, and conferences at the expense of the Development. The Site Manager shall work for the benefit of the Owner during customary business hours.

(3) The Site Manager shall be the principal day-to-day administrative employee of the Cooperative and shall have

duties usually associated with that position as prescribed by the Management Plan.

(D) It shall be the Agent's responsibility to secure from every employee working at **Lancaster Village Cooperative, Inc.** their agreement that their employment relationship is one that is at the will of the Parties.

(E) Compensation of personnel classified as off-site employees and Property Manager will be set by the Agent and will be treated as a cost of the Agent.

(F) The Agent shall determine the hiring, firing, supervision, discharging, and the setting of income of each employee subject to the terms hereinafter set forth. The Agent will have the right to hire, in the ordinary course of business, and will attempt to, on all occasions, employ people who are compatible with the Owner's Board of Directors. The Agent shall maintain an insurance policy (E.P.L.I.) that covers the potential loss as a result of employee wrongful discharge or discrimination. All compensation shall be set consistent with budgeting requirements as established by the Board of Director's of the Owner.

## XII. DISBURSEMENTS FROM GENERAL ACCOUNTS:

From the funds collected and deposited in the General Operating Account pursuant to Section VIII above, the Agent and the Owner will promptly make the following disbursements when payable:

(A) The compensation payable to the employees specified in Section XI (A) (2) above, and for the taxes and assessments payable to Local, State and Federal Government in connection with the employment of such personnel.

(B) The single aggregate payment required to be made by the Owner to the Mortgagees, including the amounts due under the Mortgages for principle amortization, interest, taxes (or service fees in lieu of taxes) and assessments, fire and other hazard insurance premiums, and the amount specified in the Owner's Regulatory Agreement for allocation to the Replacement Reserve Account.

(C) All sums otherwise due and payable by the Owner as expense of the Development authorized to be incurred under the terms of this Agreement, including compensation payable to the Agent for its services hereunder.

(D) Except for disbursements mentioned above, funds will be disbursed or transferred from the General Operating Account only as the Owner may from time to time direct. The Agent shall require such direction in all or any one instance is in writing.

(E) In the event the balance in the General Operating Account is at any time insufficient to pay disbursement due and payable, the Agent will inform the Owner of that fact, and the Owner will then submit sufficient funds or authorize the transfer of these funds to cover the deficiency. In no event will the Agent be required to use its own funds to pay such disbursements and shall only advance such sums if the Owner agrees to the same in writing.

(F) The Agent or Owner will sign, upon Owner's Board of Director's approval and direction by Resolution or Motion as required, on any negotiable instruments for all lawful expenditures in a timely manner so as to take advantage of all discounts and to avoid all service fees, penalties, and interest charges which might be applicable (payments of reoccurring expenses does not require a Board of Director's resolution). Delays caused for avoidable reasons that result in late charges, interest and penalties will be charged to the Party causing the delay.

## XIII. BUDGETS:

The Agent will prepare a recommended operating budget for each fiscal year beginning during the term of this Agreement and will submit the same to the Owner at least Sixty (60) days, before the beginning of the next fiscal year. The said budget will be submitted with such detail and back-up documentation as is reasonably necessary for the Owner to make an intelligent decision regarding expenses, and income to take into consideration in approving the annual budget. The annual budget will be reviewed and approved by the Owner, which will promptly inform the Agent of any changes incorporated in the approved budget, and the Agent will keep the Owner informed of any anticipated deviation from receipts and disbursements stated in the approved budget. **If required all budgets are subject to HUD approval as outlined in the Use Agreement and/or the Section 8 Contract.**

## XIV. RECORDS AND REPORTS:

In addition to any requirements specified in the Plan or in any other provision of this Agreement, the Agent will have the following responsibilities with respect to records and reports:

(A) The Agent will establish and maintain a comprehensive system of records, books, and accounts in a manner conforming to the directive of the Secretary and otherwise satisfactory to the Owner. All records, books, and accounts of the Owner will be subject to examination at reasonable hours by any authorized representative of the Owner, and/or any member of the Owner's Board of Directors.

(B) The Agent has the affirmative duty to utilize an up-to-date computerized system of keeping records, books, and accounts of the Owner, and fully train

the staff and employees of the Owner of the Development for any new programs or systems. This training will be paid for in the manner outlined in Section XI. This training will be paid for as agreed upon between Agent and the Board of Directors of the Owner.

(C) With respect to each fiscal year ending during the term of this Agreement, the Owner will have an annual financial report prepared by a Certified Public Accountant, based on the preparer's examination of the books and records of the Owner, in accordance with customary practices of certified public accountants for developments of similar nature. The report will be prepared in accordance with the directives of the Secretary, and will be certified by the preparer and Owner. The Annual Audited Financial Report will be prepared by the Certified Public Accountant and submitted within sixty (60) days after the end of the fiscal year for the Owner's further certification and electronic submission to the Secretary. Compensation for the services of the preparer will be paid out of the General Operating Account as an expense of the Development as approved by the Owner's Board of Directors.

(D) The Agent will furnish such information, (including occupancy reports), as may be requested by the Owner or the Secretary from time to time, with respect to the financial, physical, or operational condition of the Development after reports monthly.

(E) By the fifteenth (15th) day of each month, the Agent shall furnish the Owner's Board of Directors with a financial report including a monthly report for establishing net income, check register, list of all delinquent accounts as of the 10th day of the same month, accounts payable, occupancy status report, budget comparison report, reconciled bank statements for the General Operating Account, Trust Accounts, and any other account as of the end of the previous month in accordance with the reasonable demands of the Owner. It is the obligation of the Owner's Board of Directors to review such reports and notify the Agent on a timely basis of any discrepancies, questions or inconsistencies so that any required corrections may be made.

(F) Except as otherwise provided herein, all off-site bookkeeping, clerical and other management overhead expenses, (including but not limited to the cost of office supplies and equipment, data processing services, postage, transportation for managerial personnel and telephone charges), will be borne by the Agent out of its own funds, and such expenses will not be treated as Development expenses. There may be additional fees charged by the Agent for the resident certification accounting package as required by HUD and provided by 3rd party vendors. Costs associated with site personnel compliance training required by HUD will be paid out of the General Operating Account at the expense of the Development.

## XV. FIDELITY BOND:

The Agent will furnish, at its own expense, a fidelity bond in the sum of either $800,000.00 or a sum equal to the gross potential income of the Development for two months, whichever sum is greater, and said bond shall be conditioned to protect the Owner and the Secretary against misappropriation of Development funds by the Agent, its owners, employees, servants, officers and directors. Further, the insurance industry may require that the named insured is the Cooperative with the Agent being an additional insured. Should such type of insurance be the only type available, then such a policy shall be acceptable subject to the approval of HUD, and the Owner's Attorney. The other terms and conditions of the bond and the surety thereon will be subject to the approval of the Owner, or Owner's Attorney and the Secretary. In the event such bond only protects Agent as the named insured, the Agent does hereby irrevocably assign and transfer to the Owner's the right to settle, compromise and receive in cash or value any amount arising under the bond or under any insurance provided in lieu of any such bond. On or before thirty (30) days from the anniversary date of this Contract, the Agent will provide the Owner's attorney a copy of such bond or insurance policy in lieu thereof for the Owner's attorney's review. Failure to timely provide such policy or bond shall be considered a default under this contract. Should the bond or policy fail to meet the reasonable standard of coverage as determined by the Owner's attorney based upon what is available in the insurance market, which reasonable standard shall include but not be limited to, the extent of coverage and any deductible portion, then, upon written notice of such failure by Owner to Agent, Agent shall have thirty (30) days to cure same or offer an alternative solution that is legally equivalent to satisfy the area which is deemed deficient. In the event Agent does not cure same or offer an acceptable alternative solution as set forth herein, the Owner shall be entitled to declare this Contract terminated, and such termination shall become effective thirty (30) days following written notification to the Agent by the Owner of such election.

## XVI. BIDS, PURCHASE DISCOUNTS, REBATES OR COMMISSIONS:

1. The Owner and Agent agree to obtain contracts for material, supplies, and services from responsible contractors and vendors and prior experience with Owner at the lowest possible cost and on the terms most advantageous to the Development, and to secure and credit to the Development all discounts, rebates, commissions obtainable or obtained with respect to purchases, service contracts and other transactions on behalf of the Development. The Owner and Agent agree that all goods and services purchased from individuals or companies having an identity-of-interest with the Agent or Owner shall be purchased at cost not in excess of those that would be incurred in the making of arm's length purchases on the open market and any such purchase shall be disclosed in writing.

2. The Agent shall solicit written cost estimates, (i.e. bids), from at least three (3) contractors or suppliers for any work item which the Owner estimates will cost Five Thousand Dollars ($5,000.00) or more, and for any contract or ongoing supply or service arrangement which is estimated to exceed Five Thousand Dollars ($5,000.00) per year.

This does not include employment of professional. The bids shall be sealed and directed only to the Owner. The Owner will accept the bid that represents the lowest price, taking into consideration the bidder's reputation for quality of workmanship and/or materials, and timely performance and the time frame within which the services or goods are needed. For any contract or ongoing supply or service arrangement obtainable from more than one source and estimated to cost less than Five Thousand ($5,000) Dollars, the Agent shall solicit verbal or written cost estimates as necessary to assure that the Development is obtaining services, supplies and purchases as the lowest possible cost in relation to the reputation of the contractors so solicited. There are no Third party beneficiary rights arising under this section. The Property Manager or Site Manager shall be made a part of the Development's records and shall be retained for three (3) years form the date the work is completed.

## XVII. SOCIAL SERVICE PROGRAMS:

The Agent and/or the Owner will carry out such Social Service Programs as are from time to time set forth in the Plan, it being expressly understood that such programs are encouraged by the Agent and the Owner.

## XVIII. INSURANCE:

The Agent shall secure insurance for the Owner to be carried with respect to the Development and the Development's operations. The Agent will cause such insurance to be placed and kept in force and effect at all times. The Owner will pay premiums for such insurance out of the General Operating Account, and the premiums will be treated as a Development expense. All insurance will be placed with such beneficial interest appearing thereon as shall be acceptable to the Owner, and said insurance shall be otherwise in conformity with the Mortgages, provided that the same will include public liability insurance, with the Owner designated as a named insured, in amounts reasonably acceptable to the Agent as well as to the Owner to the extent such additional coverage does not cause the Owner to bear additional expense. The Agent will investigate and furnish an incident report to the Owner as to all known accidents, claims and potential claims for damages, relating to the Development. The Agent will cooperate with the Owner's insurer in connection therewith, and will in all instances review such subject matter with the attorney for the Owner.

## XIX. COMPLIANCE WITH GOVERNMENTAL ORDERS:

The Agent will take such actions as may be necessary to comply promptly with any and all governmental orders or other requirement affecting the Project, whether imposed by federal, state, county, or municipal authority, subject, however, to the limitation stated in Subsection XII (E) with respect to repairs. Nevertheless, the Agent shall take no such action as long as the Owner is contesting or has affirmed its intention to contest any such order or requirement. The Agent will notify the Owner in writing of all notices of such orders or other requirements within seventy-two (72) hours from the time of their receipt.

## XX. NONDISCRIMINATION:

In the performance of its obligation under this Agreement, Agent will comply with the provisions of any Federal, State, or local law prohibiting discrimination in housing on the grounds of race, color, sex, sexual preferences, creed, national origin or handicap, including Title VI of the Civil Rights Act of 1964, (Public Law 88-352, 78 Stat. 241), all requirements imposed by or pursuant to the regulations issued pursuant to Executive Order 11063, and Title VIII of the 1968 Civil Rights Act, and such other nondiscrimination acts as may be or may be applicable.

## XXI. AGENT'S COMPENSATION:

(A) The Agent will be compensated for its services under this Agreement by monthly fees to be payable, in advance and out of the Owner's General Operating Account and treated as Development expenses. Such fees will be payable on the first day of each month.

(B) The fee chargeable under this Contract will be a flat fee for **each month** in the amount of **$ 6,083.34** which represents **an annual fee of $73,000.00.**

## XXII. TERM OF AGREEMENT:

This Agreement shall be in effect for a period of **ten (10) years**, beginning on the commencement date hereinafter defined, with a right of termination by the parties hereinafter set forth.

(A) This Agreement may be terminated by either Party **with or without cause** at the end of any calendar month, provided that at least **sixty (60) days written notice** is given.

(B) In the event a Petition for Bankruptcy or Reorganization is filed by or against either of the Parties, or in the event either makes an assignment for the benefit of creditors or takes advantage of any insolvency act, the other party may terminate this Agreement by providing prompt written notice of such termination.

(C) Upon termination, the Agent will submit to the Owner within 30 days any financial statements required by the Owner; and, after the Parties have accounted to each other with respect to all matters outstanding as of the date of termination, the Owner will release the Agent against any obligations or liabilities the Agent may properly have incurred on behalf of the Owner hereunder to the extent the obligations are not due to the fault, negligence or intentional misconduct of the Agent.

(D) An arbitrator as provided in Section XXVIII may effect termination hereof.

(E) In event of termination, the Owner will promptly make arrangements to facilitate management and the Agent will turn over all Development cash, trust accounts, other accounts, investments, and records to the new approved agent within thirty (30) days of the date of termination or upon receiving notification of said approval.

(F) This contract may be cancelled by either party with or without cause with a written Sixty (60) day notice.

## XXIII. NO ASSIGNMENT:

(A) The duties, obligations, and responsibilities of the Agent under the Contract are not assignable by the Agent without the express written consent of the Owner. Any other attempted assignment without such consent shall constitute a material breach of contract by the Agent, and any such assignment shall be void.

(B) Assignment shall be understood to constitute any transfer, inter vivo or testamentary, consensual or voluntary, to any person, entity, trust or corporation, including a corporate receiver.

## XXIV. INTERNAL POLITICAL ABSTENTION:

It shall be a material breach of this Contract for an Agent to participate in or knowingly allow its employees, servants, agents, attorneys, and/or those persons acting in active concert to participate in, or take action that is intended to influence the outcome of any membership election. This provision is intended for the benefit of each Member/Tenant of the Owner.

## XXV. REFINANCE AND RENOVATION:

In the event the Cooperative seeks a refinancing or major renovation the Agent may seek additional fees in association to the work involved. The additional fees will be negotiated at the time prior to the start of this work and will be considered an addendum to this Agreement.

## XXVI. EXONERATION:

No clause, paragraph, or sentence in this Contract shall be held valid or binding that exempts the Agent from liability for damages or injury to any person or property due to the Agent's gross negligence or intentional misconduct. However, to the extent the

Owner directs the Agent to take any actions under this Contract which, due exclusively to the directions or orders of the Owner, result in liability to the Agent, then the Owner will indemnify the Agent for any liability that might arise. In addition, the Owner will indemnify and reimburse the Agent for any legal fees and court cost associated with any legal proceedings where the Agent is named as a defendant in addition to the Owner and the Agent's gross negligence or intentional misconduct was not established.

**XXVII. HUD TRANSMITTALS:**

Any requirement of HUD transmittals that are contrary to any provision of this Contract shall prevail over such contractual provision.

**XXVIII. ARBITRATION:**

In the event of any breach by either the Agent or Owner of the terms hereof, or in the event of a disagreement as to any change, adjustment, modification or amendment to this Contract, the Parties hereto agree to submit same to binding arbitration with the American Arbitration Association under the then prevailing rules for commercial arbitration of the American Arbitration Association, and the decision of the arbitrator may be confirmed into a Judgment in any court of competent jurisdiction. All cost of arbitration shall be borne by the Owner and not the Agent. Should any party determine not to abide by the ruling, thereby forcing the other party to enforce the award, any actual attorney's fees born by the enforcing party, should said party prevail, shall become part of the initial Judgment.

**XXIX. ON-SITE RECORD KEEPING:**

The Agent shall cause to be transferred to the Development at such location as shall be determined between the Agent and Owner, all original business records, receipts, bills, accounts, and memoranda relating to or pertaining to the business affairs and records of the Owner; and thereafter all such records shall be maintained at the site. The Agent is entitled to maintain a duplicate set of all such original documents if it so chooses.

**XXX. ACCESS:**

The Agent acknowledges that the property, building, equipment, etc. belong to the Owner and not the Agent. The Agent agrees to provide reasonable access to the Owner or its designee, and the Owner's Board of Director's Officers to all areas not restricted by virtue of privacy or prudent judgment, subject to the nature of the instance.

**XXXI. DIRECTIVES OF THE BOARD OF DIRECTORS:**

All lawful motions and resolutions, in compliance with this Contract and consistent with HUD Rules and Regulations, from the Owner's Board of Directors shall be handled in a prompt manner by the Agent.

## XXXII. OWNER AND AGENT INTERACTION:

It is the express expectation and understanding of the Parties hereto, that the Agent will at all times act toward the Owner's Board of Directors in a courteous and respectful manner and will conduct itself at all times so as not to degrade or lessen the esteem of any member of the Owner's Board of Directors; and, in turn, each member of the Owner's Board of Directors shall be responsible to act in the same manner towards the Agent.

## XXXIII. INTERPRETIVE PROVISIONS:

(A) This Agreement and Plan constitutes the entire Agreement between the Owner and the Agent with respect to the management and operation of the Development, and no change will be valid unless made by supplemental written agreement or otherwise permitted hereunder.

(B) This Agreement must be executed jointly by all Parties, and shall only be introduced as a complete document and evidenced in Court if signed by all Parties as an original document.

(C) Should any provision hereof, be determined illegal or contrary to public policy, then to the extent possible, such illegal provision or clause shall be severed from the Contract, and the Contract shall be read and construed as if such illegal or offending provision or clause had not been contained in the body of this Contract. To the extent a court of competent jurisdiction can reform the offending provision or clause so as to preserve the intent and spirit of the provision or clause and remedy its illegality or offensiveness, then such court is authorized by the Parties to reform the Contract accordingly.

(D) This Agreement and the HUD certification form (HUD-9839-B) constitute the entire agreement.

**XXXIV. COMMENCEMENT DATE:**

The commencement date for the purpose of this contract and for determination of the anniversary date for all renewals shall be the 1st day of July, 2014.

IN WITNESS WHEREOF, the Parties hereto have set their hands and seals on the date first written above.

**WITNESSETH:**

**"Owner"**
**Wellesley Townhouses Cooperative, Inc.**
A Michigan, non-profit Corporation

By:
Its: President

By:
Its: Secretary

**"Agent"**
**P. P. S. of Michigan, L.L.C.**
A Michigan Limited Liability Corporation

By: Esther B. Thomas
Its: Executive Vice President

# ADDENDUM TO MANAGEMENT CONTRACT
**Between**
**LANCASTER VILLAGE COOPERATIVE, INC.**
**A Michigan not for profit corporation ("Lancaster")**
**And**
**PPS of Michigan, LLC**
**A Michigan limited liability corporation ("PPS")**

WHEREAS, a certain Housing Management Agreement ("Contract") was entered into by and between the aforementioned parties dated 18th day of June, 2014 and effective date of July 1st, 2014; and

WHEREAS, as outlined in Section XXII "This Agreement shall be in effect for a period of **ten (10) years**, beginning on the commencement date hereinafter"; and

WHEREAS, in Section XXII (A) this Agreement may be terminated by either Party **with or without cause** at the end of any calendar month, provided that at least **sixty (60) days written notice** is given; and

WHEREAS, the Board of Directors of Lancaster Village Cooperative finds the performance of PPS under the terms and conditions of the contract acceptable to date; and

WHEREAS, the Board of Directors want to ensure the continuity of their Cooperative;

WHEREAS, both parties wish to amend the Contract with respect to terms and conditions;

NOW, THEREFORE, IT IS AGREED AS FOLLOWS:

1. The language in Section XXII – Term of Agreement, paragraph (A) shall be changed to read "The Parties may terminate this Agreement by **mutual consent** provided that at least sixty (60) day advance written notice is given."

2. The language in Section XXII – Term of Agreement, paragraph (G) will be added and it will read "In event the contract is terminated by the Owner, unilaterally, without mutual consent, prior to the expiration of this Agreement, liquidated damages in the amount of $6,083.34 per month will be payable immediately for the unexpired term of this agreement". For example, if there are 48 months remaining the amount of liquidating damages would be calculated at $292,000.32 ($6,083.34 multiplied by 48 months).

3. Except as expressly modified by this Addendum, the terms and conditions of the Contract are hereby ratified and shall remain in full force and effect.

IN WITNESS WHEREOF, we have hereunto set our hands this 6th day of February, 2017.

**"Lancaster"**
LANCASTER VILLAGE COOPERATIVE, INC.
A Michigan non-profit corporation

BY: James Green
ITS: President

Witness: Mark Jackson

**"PPS"**
PPS of Michigan, LLC

BY: Dino DeMare
ITS: President

Witness:

# EXHIBIT 2

## PROPOSAL SUBMITTAL

The undersigned, having familiarized themselves with the conditions affecting the cost of the work, and the Specifications (including, as applicable, Request For Proposal, Instructions to Respondents, General Conditions of Contract Between LVC and Contractor, Scope of Work, Proposal Submission, Bid Bond, Attachments, Technical Specifications, and Drawings) and any Addendum/Addenda as prepared by LVC, hereby propose to furnish all labor, materials, equipment and services required to complete the work as follows;

The purpose of this Proposal is to provide single source construction from qualified General Contractors, who are licensed and insured to conduct business within the State of Michigan. The General Contractor shall provide single source construction for the renovation of an existing 287-unit townhome style, community located in Pontiac, Michigan, with the ability to conduct said renovation with resident's in-place. The scope of work is for, but not limited to, renovations which shall include, Kitchen and Bathroom renovations. All work shall comply with the conditions set forth in this document and as contained within the project details, specifications, and any attachments contained herein. This Contract requires the Contractor to furnish all labor, materials and permits necessary to complete the project as specified herein. In the event a Contractor leaves a Proposal line item blank, the Proposal shall be deemed unresponsive and subsequently disqualified.

The undersigned, having received and familiarized themselves with the conditions affecting the cost of the work, the Specifications/Scope of Work (including, as applicable, this request for proposal, the form of payment and performance bond, the form of contract, the General Conditions, the Construction Bid Documents, and Drawings) and Addendum/Addenda No(s).____as prepared by LVC, and having visited the site and become familiar with local conditions under which the work is to be performed, hereby propose to furnish all labor, materials, equipment and services required to complete the work as follows:

**PROPOSAL AMOUNT: Pricing by Unit Type. (Refer to Attachments A & B for layouts and descriptions)**

| | Unit A | Unit B | Unit C | Unit E | Unit F | Unit H | Unit I | Unit K | Unit L |
|---|---|---|---|---|---|---|---|---|---|
| **Kitchens:** | | | | | | | | | |
| Cabinets & Countertops | 5075 | 4650 | 4650 | 4850 | 4650 | 4575 | 4650 | 4850 | 4850 |
| Kitchen Flooring | 2100 | 2100 | 2100 | 2100 | 2100 | 2100 | 2100 | 2100 | 2100 |
| Sub-Flooring | 1,350 | 1350 | 1350 | 1350 | 1350 | 1350 | 1350 | 1350 | 1350 |
| Furnace Room Floor | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 | 2000 |
| **1/2 Baths:** | | | | | | | | | |
| Bath Flooring | 975 | 975 | 975 | 975 | 975 | 975 | 975 | 975 | 975 |
| Sub-Flooring | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 | 525 |
| Toilet | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Vanity & Countertop | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| Tub & Tub Walls | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 |
| **Master Baths:** | | | | | | | | | |
| Bath Flooring | 1375 | 1375 | 1375 | 1375 | 1375 | 1375 | 1375 | 1375 | 1375 |
| Sub-Flooring | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 | 700 |
| Toilet | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 |
| Vanity & Countertop | 1,000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| Tub & Tub Walls | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 | 2250 |
| **Electrical HVAC:** | | | | | | | | | |
| Alumiconn Replace | 2750 | 2750 | 2750 | 2750 | 2750 | 2750 | 2750 | 2750 | 2750 |
| Water Shut-off replace | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 |
| Gas Shut-off replace | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 | 275 |
| Installation of fan/vent | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |

RFP# 03022020

**A. WORK NOT OTHERWISE SPECIFIED (NOS):**

All other work <u>Not Otherwise Specified (NOS)</u> within the scope of this Proposal Document shall be agreed to in writing by LVC as a Change Order as defined in Section II, 9. The hourly rates for any work NOS shall require an estimate. Pricing provided in this section will include all labor, transportation, and overhead necessary to complete any work defined as NOS (Not Otherwise Specified) within this document and attachments.

**<u>PRICES IN THIS SECTION SHALL NOT BE INCLUDED IN BASE SUBMITTAL:</u>**

**B. RESPONDENT INFORMATION:**

1. Respondent understands that all unit prices must be provided in the appropriate spaces. The unit prices shall include all labor, materials, overhead, profit, insurance, etc. to cover the work specified.

2. The Respondent understands that the LVC reserves the right to reject any or all Proposals and to waive any informality in the selection process. The Respondent agrees that this Proposal shall be good and may not be withdrawn or altered for a period of Sixty (60) Calendar Days after the scheduled closing time for receiving Proposals.

3. The Respondent hereby agrees to commence work under this Contract on or after a date to be specified in the "Notice of Proceed" by LVC and to fully complete the project(s) as specified in the Notice of Proceed.

Respectfully Submitted:

By: [signature]
(Authorized Signature)

George [illegible] Sales
(Typed or Printed Name and Title)

Company Name: [illegible]
Address: 19250 [illegible]
[illegible]

Federal ID #:
Phone: 734 [illegible] 0596
Contact Person: George [illegible]
Email Address: [illegible]@gmail.com

**SHELDON B. KOHN**
ATTORNEY AT LAW, PLLC

May 17, 2024

Michael S. Hale, Esq.
21500 Haggerty - Suite 140
Northville, MI 48167

Re: Redford Cement/D&G v Lancaster
Subpoena to Stathakis, Inc.

Dear Mr. Hale,

Please be advise Stathakis, Inc. has forwarded a copy of your subpoena in the above matter for response.

You are advised that Stathakis, Inc. has had no communications of any kind with any of the parties identified in your subpoena, and has not submitted any bids, and has not authorized anyone else to have any part in any bidding on its behalf, in regard to the transaction that appears to be involved your law suit. I am happy to prepare and submit an affidavit in that regard, signed by a principal officer of the company.

"Stathakis" is an assumed name of Stathakis, Inc., registered with the State of Michigan. It has not conducted business on Allen Road in about 10 years, and (in fact) sold that building about 8 years ago (not to George).

George Stathakis is not an owner, employee, officer, director or agent of Stathakis, Inc., and has no authority to act on behalf of the company; any representations or implications made by him to the contrary are fraudulent.

I would appreciate written confirmation from you that the subpoena is withdrawn.

Thank you for your cooperation, and let me know if you have any questions.

Very truly yours,
**Sheldon B. Kohn, Attorney at Law, PLLC**

By: ______________________
Sheldon B. Kohn

C: Chris Stathakis @ Stathakis, Inc.
SBK/sjko
C:\Users\Shel Office\OneDrive - sheldonkohnlaw.com\SBKDocs\ClientDocs\Stathakis v George\RedfordLancasterSubpoena\sbkLetterhead.wpd May 17, 2024

# AFFIDAVIT

The undersigned, Chris Stathakis, states the following, having personal knowledge of the facts, and under penalties of perjury:

1. He is Chief Executive Officer of Stathakis, Inc.
2. He oversees the preparation of bids on behalf of the corporation.
3. Stathakis, Inc. has filed an assumed name at the State of Michigan to do business under the name "Stathakis".
4. George Stathakis is not an owner, employee, office, director or agent of Stathakis, Inc., and has no authority to act on behalf of Stathakis, Inc. in any matter whatsoever.
5. Stathakis, Inc. has not conducted business on Allen Road in Taylor, Michigan for approximately 10 years, and sold that building approximately 8 years ago, to someone other than George Stathakis.
6. Stathakis, Inc. did not participate in bidding for any construction projects at Lancaster Village Cooperative, and did not authorize any other person to do so on its behalf.

Date: May 22, 2024

C A Stathakis
Chris Stathakis

C:\Users\Shel Office\OneDrive - sheldonkohnlaw.com\SBKDocs\ClientDocs\Stathakis v George\RedfordLancasterSubpoena\Affidavit.wpd May 22, 2024

# EXHIBIT 3

# Lancaster Village

633 Palmer Dr.

Pontiac, MI 48342

(734) 729-3328




Bid for Proposal #03022020

Kitchens & Baths

2020

**REQUEST FOR PROPOSAL NO. 03022020**

**GENERAL CONTRACTING SERVICES**
**FOR THE RENOVATION OF LANCASTER VILLAGE CO-OP**

Lancaster Village Co-Op (hereinafter referred to as "LVC") is soliciting proposals from qualified General Contractors that are licensed and insured to conduct business within the State of Michigan. General Contractors shall provide single construction for the renovation of an existing townhome style community located in Riverview, Michigan, with the ability to conduct this renovation with residents in place. The scope of work is for, but not limited to, renovations which shall include: replacement of siding, windows, aluminum trim and spray foam insulation. All work shall comply with the conditions set forth in this document and as contained within the project details, specifications, and any attachments contained herein. This Contract requires the Contractor to furnish all labor, materials and permits necessary to complete the project as specified herein.

A pre-submittal conference will be held onsite at the Management Office of Lancaster Village Co-Op, 633 Palmer Dr., Pontiac, MI 48342, at _______**AM/PM** on _______________. This meeting is optional. If you require any aids or services to fully participate in this meeting, please call (248) 373-8280

All questions must be submitted in writing. All questions submitted will be answered five (5) business days prior to the Proposal due date.

Proposals will be received by Lancaster Village Co-Op, 633 Palmer Dr., Pontiac, MI 48342, until **2:00 PM** on **May 15, 2020.** Delivery of Proposals by fax or email is **not** acceptable. Proposals received after the due date and time will **not** be considered and will be returned unopened to the Respondent. **Please provide four copies of the Proposals (one original and three copies of the original).** Proposals will only be accepted from those General Contractors that can establish, to the satisfaction of LVC, the reliability and responsibility of the persons or entities proposed to furnish and perform the Work described in the Proposal Documents and provide satisfactory evidence of, and references for, completion of projects **in the capacity as a General Contractor of similar scope.**

The Proposal shall be accompanied by a certified check or bank draft, payable to LVC, or a satisfactory Bid Bond executed by the Respondent and a Surety that is acceptable to the Federal Government, in an amount equal to Five Percent (5%) of the Proposal. Failure to comply with this requirement may cause the Proposal to be considered non-responsive, and subject to rejection.

The term of this Contract shall be for a period of Twelve (12) months from date of the Notice to Proceed (NTP).

The Contract will be awarded to the Responsive and Responsible Respondent offering the best combination of qualifications and price, who meets the **Qualification Requirements outlined in Part I Section G**. No Respondent may withdraw or alter their Proposal within Thirty (30) days after the Proposal opening. LVC maintains the right to reject any or all Proposals. LVC has the right to waive informalities and irregularities in a Proposal received and to accept the Proposal that, in LVC's judgment, is in LVC's best interests. A Proposal is defined as a complete and properly executed written proposal to do the Work for the sums stipulated therein, submitted in accordance with the Proposal Documents. The Proposal Documents include the submittal Requirements, the proposed Contract Documents and any Reference Documents. LVC's selection committee shall review the Respondents' qualifications and price in accordance with the published Selection Criteria. Based on these criteria, the committee will choose the Respondent deemed "qualified" with the best combination of factors and price who will be selected to enter into a contract for this project.

TABLE OF CONTENTS

## Contents


TABLE OF CONTENTS .......... 3

I. GENERAL .......... 5

A. Introduction .......... 5

B. Property Description .......... 5

C. Pre-Proposal Meeting and Bid Documents .......... 5

D. Questions .......... 6

E. Due Date .......... 6

F. Addendum .......... 6

G. Minimum Qualifications .......... 6

H. Selection .......... 7

1. Selection Criteria .......... 7

II. SCOPE OF WORK .......... 8

A. General Scope of Work .......... 8

B. General Requirements .......... 8

1. Code Compliance and Inspections .......... 8

2. Contract Documents .......... 9

3. Permits .......... 9

4. Renovation in Place Requirements .......... 9

5. Warranty .......... 10

6. Security .......... 11

7. Emergency Contact .......... 11

8. Change Orders .......... 11

C. Project Requirements .......... 11

D. Contract Term .......... 11

E. Other Contract Terms .......... 11

F. Liquidated Damages .......... 12

PROPOSAL SUBMITTAL ........ 13

A. RESPONDENT'S CONTACT INFORMATION: ........ 15

B. RESPONDENT'S BUSINESS STRUCTURE: ........ 15

C. RESPONDENT'S FINANCIAL INSTITUTE: ........ 18

D. RESPONDENT'S SAFTEY PROGRAM: ........ 21

PROPOSAL SUBMISSION CHECKLIST ........ 24

END OF SECTION ........ 24

Attachment A ........ 25

Attachment B ........ 30

**REQUEST FOR PROPOSAL NO. 03022020**
**GENERAL CONTRACTING SERVICES**
**FOR THE RENOVATION OF LANCASTER VILLAGE CO-OP**

## I. GENERAL

### A. Introduction

LVC is soliciting proposals from qualified and licensed General Contractors (hereinafter referred to as "Respondents") for the renovation of an existing townhome style, community in Riverview, Michigan.

All work in connection with this Request for Proposal (RFP) shall comply with the project details contained herein, and the scope of work, finish schedules and following standard guidelines listed in the VSI manual. Additional project information is contained in the General Requirements section below. The information provided in this RFP will be incorporated into the contract as part of the specifications for the project.

Work will take place around both occupied and unoccupied units, all owned and managed by LVC. A minimum **72-hour notice** must be provided to a resident by the management office prior to entering an occupied unit. LVC Property Management will provide access to all units, and will coordinate the scheduling of the work.

The units are occupied and the work will be performed with tenants in place.

### B. Property Description

The property located at 633 Palmer Dr. is improved by townhome style buildings that make up 287 units. Different Style units exist. The community was constructed in 1969. The property consists of thirty-five (35) buildings. The units are currently occupied and tenants will remain in place during construction. The property is served with all necessary utilities.

### C. Pre-Proposal Meeting and Bid Documents

A pre-proposal meeting will be held on ______________, **at _____AM/PM,** at the Management Office of Lancaster Village Co-Op, 633 Palmer Dr., Riverview, MI. **This meeting is optional to submit a proposal.** If you require any aids or services to fully participate in this meeting, please call (248) 373-8280

**D. Questions**

All questions regarding the project and supporting documentations must be submitted to LVC. The deadline for submitting any and all questions is five (5) business days prior to the due date.

**E. Due Date**

Proposals will be received by LVC's Purchasing Office, located at 633 Palmer Dr., Pontiac, MI 48342, **no later than 2:00 p.m., on May 15, 2020.**
**Please provide total of (4) copies. Delivery of proposals by fax or email is not acceptable.** Proposals received after the due date and time may not be considered, and if disqualified will be returned unopened to the Respondent.

**F. Addendum**

1. In the event this solicitation is amended, all terms and conditions which are not modified remain unchanged.

2. Respondents shall acknowledge receipt of any Addendum to this solicitation by signing and returning the Addendum with their proposal. Failure to acknowledge receipt of any Addendum will result in the rejection of Respondent's proposal if the Addendum contained information that substantively changed LVC's requirements.

**G. Minimum Qualifications**

1. Proposals will only be accepted from Respondents who provide satisfactory evidence of, and references for completion of **single projects of similar scope with tenants in place** and with contract values of at least Three Million, Dollars ($3,000,000.00).

2. Respondent's references shall demonstrate successful experience with multi-family residential remodeling (rehab) with tenants in place in the, Detroit Metropolitan, or the surrounding areas.

3. The Proposal shall be accompanied by a certified check or bank draft, payable to LVC, or a satisfactory Bid Bond executed by the Respondent and a Surety that is acceptable to the Federal Government, in an amount equal to Five Percent (5%) of the Proposal. Failure to comply with this requirement may cause the Proposal to be considered non-responsive, and subject to rejection.

4. The successful Respondent will be required to furnish and pay for satisfactory Performance and Payment Bonds for One Hundred Percent (100%) of the Contract value.

5. Contractor shall provide a copy of all current State licensing for the Company and its employees necessary to perform the scope of work contained herein. Provide your own documents.

**The Qualification Information listed above shall be submitted with the Contractor's Proposal. Failure to provide all required documentation with packet submission may be deemed an incomplete submission and subject to disqualification.**

LVC reserves the right, at its sole discretion, to accept or reject any and all proposals received as a result of this RFP; to waive minor irregularities; and to conduct discussions with all responsible Respondents, in any manner necessary, to serve the best interest of LVC. LVC reserves the right to request additional information from any or all Respondents if necessary to clarify that which is contained in the submissions.

While it is the present intention of LVC to carry out the development of the property as identified in this RFP as soon as practicable, nothing contained in this RFP shall be construed as a warranty or commitment on the part of LVC to be obligated to develop all or any portion of the property. LVC shall not be liable for any costs, damages, injuries, or liabilities caused to or suffered or incurred by the Respondent, its successor or assigns in connection with, or as a result of LVC's inability to meet deadlines or any preliminary schedules.

## H. Selection

LVC's selection committee will review the Respondents' qualifications and price. Based on these criteria, the committee will choose those Respondents deemed "qualified." The Respondent with the best combination of factors and price will be selected to enter into a contract for this project.

### 1. Selection Criteria

LVC will use the following criteria to evaluate the proposals and will rate each Respondent accordingly:

a. Experience (30%)

b. Demonstrated ability for on-time completion (5%);

c. Financial Strength (15%);

d. Contractor Qualifications (40%), showing experience with similar project types (townhome style unit renovations with tenants in place), and References Sheet;

e. Price (10%)

## II. SCOPE OF WORK

### A. General Scope of Work

LVC seeks to enter into a contract with a General Contractor (hereinafter "Contractor") to perform a renovation with tenants in place on a 287 unit townhome style unit complex located at 633 Palmer Dr., Riverview, MI, Michigan.

Before commencement of any work, the selected Contractor must furnish LVC with payment and performance bond documents and certificates for any required insurance at no additional cost to LVC.

The Contractor shall provide all labor, materials, equipment, transportation, and permits necessary to perform the work as set forth in the Request for Proposal, Scope of Work, and Construction Bid Documents.

Upon issuance of the Notice to Proceed and before commencing work, the Contractor shall visit the site to verify field conditions. Should variations arise between the field conditions and the construction documents, the Contractor must notify LVC, in writing, of any discrepancies immediately.

1. Any changes or additional work done without the prior written consent LVC shall be at the Contractors' risk.
2. LVC reserves the right to add to or delete any work specified in this contract.
3. The Contractor shall coordinate all work with LVC.
4. Use Documents Labeled ***Lancaster Village Co-Op***

### B. General Requirements

#### 1. Code Compliance and Inspections

The Contractor shall ensure that all work is performed in accordance with State and local codes that apply to Contractor's Scope of Work. Any work not in accordance with codes shall be corrected by the Contractor at no additional cost to LVC.

The Contractor shall schedule all necessary inspections required by State and local codes, with the appropriate code enforcement staff and notify the LVC Project Manager of inspection results in writing within seventy-two (72) hours of receiving such reports.

**2. Contract Documents**

a. The parties shall utilize AIA Construction Contract forms and General Conditions with supplemental conditions applicable to LVC projects. LVC intends to use the following ***Contract Documents:***
***- AIA Forms G702 and G703.***

**3. Permits**

a. Contractor is responsible for assuring that all necessary trade permits are obtained (as applicable) for work requested by the Contract Administrator or authorized LVC representative. The cost of trade permits shall be included in the Contractor's proposal. LVC shall provide the building permit only.

b. Contractor is responsible for proper posting of all permits on the project sites per Pontiac, MI requirements. Copies of all permits will be provided to the LVC Project Manager or authorized LVC representative prior to beginning any work.

c. All permits fees are to be included in contract price.

**4. Renovation in Place Requirements**

a. No work will be performed before 8:00 a.m. or later than 7:00 p.m. Monday through Friday unless written permission is given by the Project Manager.

b. Work can be performed on Saturdays only with written permission from the Project Manager.

c. The staging area(s) will be discussed and approved between the Construction Manager and the General Contractor.

d. Except in the case of an emergency, no work will be performed on Sundays or holidays.

e. Contractor shall be required to attend pre-construction meetings, as directed by Owner, to discuss construction operations with the residents and property management. Contractor shall provide a detailed schedule for each building.

f. Contractor shall provide for personnel identification of all staff to ensure Owner, property management and the residents are aware of construction staff.

g. A minimum 72-hour notice must be provided to a resident by the management office prior to entering an occupied unit.

h. Any discrepancies or suspected errors in the drawings or specifications shall be immediately brought to the attention of the LVC.

i. The Contractor must walk the property and will be responsible for field measuring.

j. The Contractor will be responsible for any damage to resident's personal property done by his employees or subcontractors.

k. The health and safety of the residents is of the highest priority during the construction of this project.

l. All work will be performed as per VSI standards.

m. The General Contractor is responsible for protection of resident property within the unit units. The Contractors shall take all necessary steps to protect property from construction activity. Homes shall be left in a clean condition at the end of each working day. No debris is to be left behind.

n. Contractor shall provide means for photography or video of existing conditions of each residence prior to starting construction renovation in each unit.

o. Contractor must provide 24-hour emergency contact information.

p. Residents will not be required to leave their homes during the renovation; contractor should plan for working around families in a safe and courteous manner

q. The Contractor or his subcontractors shall obtain all required permits (trade and building) for the work to be performed. Copies of all permits will be provided to the LVC Project Manager.

**5. Warranty**

a. All work shall be performed in a professional and safe manner according to OSHA safety standards as well as all manufacturers' specifications.

b. Upon completion of work, Contractor shall provide copies of all manufacturer warranties and operating manuals on materials and equipment to the LVC Project Manager on a per-unit basis. In addition, the Contractor shall provide a one (5)-year warranty on all work performed.

c. All materials shall be new, as per specifications, and are to be installed according to the manufacturers' instructions.

d. In the event any work performed under the Contract does not meet manufacturer's installation guidelines and specifications; the Contractor shall be notified in writing of the deficiency. Corrective action shall commence within 24 hours of notification for all work found unacceptable to LVC's designated representative by the Contractor at no additional cost to LVC. In the event corrective action is not taken in a timely manner, as determined by the Contract Administrator or authorized LVC representative, LVC reserves the right to terminate the Contract or any portions thereof.

6. **Security**

The Contractor shall perform all work in a safe and secure environment per OSHA standards while under construction and in accordance with the highest standards of the construction industry.

7. **Emergency Contact**

Prior to the commencement of work the Contractor shall provide the LVC Project Manager and Construction Manager with twenty-four (24) hour emergency contact names and telephone numbers for two (2) individuals.

8. **Change Orders**

   a. Any request for changes to the Scope of Work after contract is awarded must be made in writing to LVC's Project Manager. This includes any work that would increase or decrease the cost of the work, any additions or subtractions to the quantity of materials of work and any change that would affect the completion date of the contract. Any changes made without a signed change order from LVC will be at the sole risk of the Contractor and will be done at no additional cost to LVC.
   b. All items or hidden damage discovered that may necessitate a Change Order Request from the Contractor must be documented by photographs and accompanied by detailed descriptions.

**C. Project Requirements**

Upon submitting their proposal, the Respondent warrants that it has visited the job site and familiarized itself with the work plans and specifications (Construction Bid Documents) as may apply to this Contract.

**D. Contract Term**

1. The time to complete this work shall be twelve (12) months from the date of the Notice to Proceed.

2. After the contract has been signed by LVC and the Contractor, the Contractor shall, within fourteen (14) days, hold a pre-construction meeting with the LVC Project Manager to establish a work schedule. This schedule shall include an outline of the work, scheduled start and completion dates, and shall be in accordance with the requirements in the project specifications (Drawings and/or Request for Proposal).

**E. Other Contract Terms**

1. Utilities are currently available on the property. Contractor is responsible for temporary toilet and trash removal including construction materials.

2. The property is occupied and work will be performed with tenants in place. No construction work is to take place earlier than 8:00 a.m. or after 7:00 p.m. Monday through Friday. No additional work hours, including weekends and holidays, will be permitted without prior written approval from the Project Manager.

**F. Liquidated Damages**

Failure to complete the work as specified in the contract may result in Liquidated Damages in the amount of Three Hundred Dollars ($300.00) per unit per calendar day for each day that the work remains incomplete after the contract completion date until such time as Substantial Completion of the contract is achieved. (Weather conditions will be considered)

## PROPOSAL SUBMITTAL

The undersigned, having familiarized themselves with the conditions affecting the cost of the work, and the Specifications (including, as applicable, Request For Proposal, Instructions to Respondents, General Conditions of Contract Between LVC and Contractor, Scope of Work, Proposal Submission, Bid Bond, Attachments, Technical Specifications, and Drawings) and any Addendum/Addenda as prepared by LVC, hereby propose to furnish all labor, materials, equipment and services required to complete the work as follows;

The purpose of this Proposal is to provide single source construction from qualified General Contractors, who are licensed and insured to conduct business within the State of Michigan. The General Contractor shall provide single source construction for the renovation of an existing 287-unit townhome style, community located in Pontiac, Michigan, with the ability to conduct said renovation with resident's in-place. The scope of work is for, but not limited to, renovations which shall include, Kitchen and Bathroom renovations. All work shall comply with the conditions set forth in this document and as contained within the project details, specifications, and any attachments contained herein. This Contract requires the Contractor to furnish all labor, materials and permits necessary to complete the project as specified herein. In the event a Contractor leaves a Proposal line item blank, the Proposal shall be deemed unresponsive and subsequently disqualified.

The undersigned, having received and familiarized themselves with the conditions affecting the cost of the work, the Specifications/Scope of Work (including, as applicable, this request for proposal, the form of payment and performance bond, the form of contract, the General Conditions, the Construction Bid Documents, and Drawings) and Addendum/Addenda No(s).____as prepared by LVC, and having visited the site and become familiar with local conditions under which the work is to be performed, hereby propose to furnish all labor, materials, equipment and services required to complete the work as follows:

**PROPOSAL AMOUNT: Pricing by Unit Type. (Refer to Attachments A & B for layouts and descriptions)**

| | | Unit A | Unit B | Unit C | Unit E | Unit F | Unit H | Unit I | Unit K | Unit L |
|---|---|---|---|---|---|---|---|---|---|---|
| Kitchens: | | | | | | | | | | |
| | Cabinets & Countertops | | | | | | | | | |
| | Kitchen Flooring | | | | | | | | | |
| | Sub-Flooring | | | | | | | | | |
| | Furnace Room Floor | | | | | | | | | |
| 1/2 Baths: | | | | | | | | | | |
| | Bath Flooring | | | | | | | | | |
| | Sub-Flooring | | | | | | | | | |
| | Toilet | | | | | | | | | |
| | Vanity & Countertop | | | | | | | | | |
| | Tub & Tub Walls | | | | | | | | | |
| Master Baths: | | | | | | | | | | |
| | Bath Flooring | | | | | | | | | |
| | Sub-Flooring | | | | | | | | | |
| | Toilet | | | | | | | | | |
| | Vanity & Countertop | | | | | | | | | |
| | Tub & Tub Walls | | | | | | | | | |
| Electrical HVAC: | | | | | | | | | | |
| | Alumiconn Replace | | | | | | | | | |
| | Water Shut-off replace | | | | | | | | | |
| | Gas Shut-off replace | | | | | | | | | |
| | Installation of fan/vent | | | | | | | | | |

**A. WORK NOT OTHERWISE SPECIFIED (NOS):**

All other work **Not Otherwise Specified (NOS)** within the scope of this Proposal Document shall be agreed to in writing by LVC as a Change Order as defined in Section II, 9. The hourly rates for any work NOS shall require an estimate. Pricing provided in this section will include all labor, transportation, and overhead necessary to complete any work defined as NOS (Not Otherwise Specified) within this document and attachments.

**PRICES IN THIS SECTION SHALL NOT BE INCLUDED IN BASE SUBMITTAL:**

**B. RESPONDENT INFORMATION:**

1. Respondent understands that all unit prices must be provided in the appropriate spaces. The unit prices shall include all labor, materials, overhead, profit, insurance, etc. to cover the work specified.

2. The Respondent understands that the LVC reserves the right to reject any or all Proposals and to waive any informality in the selection process. The Respondent agrees that this Proposal shall be good and may not be withdrawn or altered for a period of Sixty (60) Calendar Days after the scheduled closing time for receiving Proposals.

3. The Respondent hereby agrees to commence work under this Contract on or after a date to be specified in the "Notice of Proceed" by LVC and to fully complete the project(s) as specified in the Notice of Proceed.

Respectfully Submitted:

By: ______________________________
(Authorized Signature)

______________________________
(Typed or Printed Name and Title)

Company Name: ______________________________
Address: ______________________________

Federal ID #: ______________________________
Phone: ______________________________

Contact Person: ______________________________
Email Address: ______________________________

**A. RESPONDENT'S CONTACT INFORMATION:**

Respondent must list the legal name, title, email address, mailing address, phone number and fax number including the individual who will be the contact person for the term of the Contract resulting from this RFP.

Name: ______________________________

Title: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

Website: ______________________________

Name, title and address of company contact (if different from above):

Name: ______________________________

Title: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

Website: ______________________________

**B. RESPONDENT'S BUSINESS STRUCTURE:**

Respondent must identify the business structure, state of incorporation, principal officers, partners, or individuals who would be under the term of the Contract resulting from this RFP.

(Check One) ☐ Corporation ☐ Co-Partnership/LLC ☐ Individual

**1. If a corporation :**

Date of incorporation (MM/YY): ______________________________

Principal Officers: ______________ Title: ______________ Date of assuming position: ______________

_______________ _______ _______________

**2. If co-partnership:**

Date of organization (MM/YY): ______________________

Nature of partnership (General, Limited or Association): ______________

Names and addresses of partners: ______________________

**Partner 1:**

Name: ______________________

Title: ______________________

Mailing Address: ______________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________

**Partner 2:**

Name: ______________________

Title: ______________________

Mailing Address: ______________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________

**Partner 3:**

Name: ______________________

Title: ______________________

Mailing Address: ______________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________

(if more than three partners, please include on separate sheet)

3. **If individual:**

   Name: ______________________________

   Title: ______________________________

   Mailing Address: ______________________________

   Phone Number: ______________ Fax Number: ______________

   E-Mail Address: ______________________________

   Website: ______________________________

1. Contractor's current Bonding Company:

   Company Name: ______________________________

   Contact Person: ______________________________

   Mailing Address: ______________________________

   Phone Number: ______________ Fax Number: ______________

   E-Mail Address: ______________________________

2. Contractor's current Insurance Company: (General Liability, Workers' Comp., etc.)

   Company Name: ______________________________

   Contact Person: ______________________________

   Mailing Address: ______________________________

   Phone Number: ______________ Fax Number: ______________

   E-Mail Address: ______________________________

**C. RESPONDENT'S FINANCIAL INSTITUTE:**

Respondent must provide in detail the name and contact person of their primary banker who will or may provide financial information determining the Contract resulting from this RFP.

Contractor's Primary Bank:

Institution Name: ______________________________

Contact Person: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

Contractor hereby authorizes its Primary Bank Relationship Officer to release general information requested by the LVC as part of its due diligence Financial and Safety Review process.

**SIGNATURE:** ______________________________

Printed Name: ______________________________

1. List at least Three (3) subcontractors in various fields who have worked under you. Include addresses and telephone numbers:

**Subcontractor 1:**

Company Name: ______________________________

Title: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

**Subcontractor 2:**

Company Name: ______________________________

Title: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

**Subcontractor 3:**

Company Name: ______________________________

Title: ______________________________

Mailing Address: ______________________________

Phone Number: ______________ Fax Number: ______________

E-Mail Address: ______________________________

2. What is the contract value of the largest project accomplished by your organization?

   $ ____________________________________

3. What is the contract value of largest project completed in the last Five (5) years?

   $ ____________________________________

4. Maximum value you prefer to undertake.

   $ ____________________________________

5. Price range of work your organization is deemed best qualified to undertake.

   $ ____________________________________

6. Is your organization licensed in the State of Michigan for the current year?

   ☐Yes ☐ No

   License number:________________ and expiration date: ____________

7. Are you familiar with the local building code and ADA accessibility requirements that pertain to your discipline for Riverview, MI (i.e. electrical, mechanical, structural, building in general)?

   ☐Yes ☐ No

   If no, explain:

   ______________________________________________________________

   ______________________________________________________________

   ______________________________________________________________

   ______________________________________________________________

8. Are you familiar with the permit requirements for Riverview, MI?

   ☐Yes ☐ No

**D. RESPONDENT'S SAFTEY PROGRAM:**

Respondent must include the following information that describes the general nature of safety program performed by Respondent, within the last Five (5) years:

**A.** Do you have a Written Safety Program

☐Yes ☐ No

If yes, briefly describe scope or provide a copy of your program:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

**B.** Any OSHA Citations in the last Five (5) years?

☐Yes ☐ No

If yes, explain the circumstances:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

**C.** Do you have a Company Safety Director or other safety contact?

☐Yes ☐ No

If no, explain:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

**D.** Do you perform regular job site safety inspections?

☐Yes ☐ No

If no, explain:

________________________________________

________________________________________

________________________________________

________________________________________

The Undersigned certifies under oath that the information provided herein is true and sufficiently complete so as not to be misleading.

The foregoing statements are certified to be true and accurate.

Dated at______________________________this_________day of_____________20____

***(City, State)***

By: ______________________________________

***(Signature)***

______________________________________

***(Title of person signing)***

______________________________________

***(Name of organization)***

**STATE OF** ____________________________________

**COUNTY OF** ____________________________

________________________________________________________ being duly sworn,
states that

he/she is______________________________of ________________________________________

***(Official title)*** ***(Name of organization)***

and that the answers to the foregoing questions and all statements therein contained are true and correct.

Sworn to before me this______________________________day of_____________20____

______________________________________

***Notary Public***

**My commission expires**________________________

## PROPOSAL SUBMISSION CHECKLIST

Please check off the following items and include them with your submittal. **Please note, all items submitted, must be completed in its entirety:**

- ☐ Proposal Submittal
- ☐ Signature Page
- ☐ Contractor's Statement of Qualifications
- ☐ Bid Bond
- ☐ Signed Addenda, if applicable
- ☐ Applicable Michigan Contractors License
- ☐ Certificate of Insurance

**END OF SECTION**

Attachment A

# Scope of Work:

Kitchen Remodel consisting of:

Floor replacement
Sub-floor replacement, if needed
Furnace Room Floor if needed
Cabinet and countertop replacement

½ Bath and Master Bath Remodel consisting of:

Floor replacement
Sub-floor replacement, if needed
Vanity replacement
Toilet replacement
Bath tub and wall system replaced

Electrical/HVAC (where needed):

Alumiconn Replacement
Water and Gas Shut-off
Light/Vent/Fan installed
GFCI's

Details can be found on the following pages in this Attachment:

# General Notes:

- All debris must be removed off-site in approved containers and taken to an approved land-fill or recycled facility
- A site will be designated by Maintenance for dumpsters
- A site will be designated for material storage containers
- Work hours: Staging after 7:30 am

  Unit entry 8:00am

  Unit lock up 5:00 pm
- Someone from maintenance will open the unit and inspect before each work day and lock up at the end of each work day.
- See attached spreadsheets for quantities and addresses for the scope of work.
- All necessary city permits are the responsibility of the Contractor
- All city permits will be added, AT COST, to the final invoice.
- A preliminary bid meeting will be held on ______________________
- All Bids are due on May 15, 2020 by 2:00 PM

# Kitchen

Kitchen Countertops and/or Cabinets:

- Remove existing counter-tops and cabinetry (if kitchen cabinetry is being replaced)
- Save the existing sink, faucet, garbage disposal, and hood vent for re-installation unless replacement is needed. If replacement is needed, see Maintenance Supervisor for replacement parts and disposal of old parts.
- Supply and install new Kraftmaid Hanley Oak Honey Spice cabinets according to the provided CAD drawings per each style unit. Field verify all measurements to allow for maximum cabinet widths. For example B30 increased to a B33 if the existing wall allows for the larger cabinet. All kitchen cabinets and countertops to be replaced must be field measured and is the sole responsibility of the contractor.
- Cabinets must include the soft closed doors and drawers option
- Sink base cabinets to have the Coreguard option
- Supply and install self-edged 90 degree edge custom fabricated laminated countertops Color and Manufacturer: Wilsonart Tumbled Roca # 4835-38
- Supply and install 5" tall ¾" thick backsplashes utilizing the smart clip installation method

Kitchen Flooring:

- If flooring is being replaced, remove existing finished floor including any underlayment down to the original sub-floor
- Supply and install ¼" smooth plywood over existing sub-floor
- Supply and install Karndean glue down 18 x 18 vinyl tiles. Install new flooring according to the manufacturer's recommendations.
- Supply and install 4" almond commercial grade vinyl cove base with cove base adhesive. Use 6" cove base to cover old paint lines if necessary.

Furnace Room Flooring:

- If flooring is being replaced, remove existing finished floor including any underlayment down to the original sub-floor
- Supply and install ¼" smooth plywood over existing sub-floor
- Supply and install Karndean glue down 18 x 18 vinyl tiles. Install new flooring according to the manufacturer's recommendations.
- Supply and install 4" almond commercial grade vinyl cove base with cove base adhesive. Use 6" cove base to cover old paint lines if necessary.

Kitchen Plumbing:

- Re-install the sink, faucet, hood vent, garbage disposal. If any of the existing items are damaged and need to be replaced, maintenance will supply new.
- Supply and install new SS braided supply lines, compression ¼ turn ball valve shut-offs, plastic p-trap, and metal chrome escutcheon ring/plate.

# Half Bath

Bathroom Plumbing:

- If flooring is being replaced, remove existing toilet, wax ring, supply line, and shut-off
- If toilet is being replaced, supply and install new Kohler Cimarron White toilet with new wax ring, bolts, Kohler white seat, SS braided supply line, and compression ¼ turn ball valve shut-off with new chrome metal escutcheon ring/plate
- Remove existing vanity and vanity top in preparation for floor removal and new installation, per the attached spreadsheet. If replacement not needed, SAVE FOR REINSTALLATION.

Bathroom Flooring (If flooring is being replaced):

- Remove existing finished floor including any underlayment down to the original sub-floor
- If sub-floor has water damage and needs replacement, Maintenance must be notified before repairs are made. Remove damaged sub-floor and replace with ¾" OSB sub-floor sheeting . Additional charge will be added to invoice.
- Supply and install ¼" smooth plywood over existing sub-floor
- Supply and install Sherwin Williams glue down 16 x 16 vinyl tiles. Install new flooring according to the manufacturer's recommendations.
- Supply and install 4" almond commercial grade vinyl cove base with cove base adhesive. Use 6" cove base to cover old paint lines if necessary.
- Install new vanity and countertop, or existing if reusable, using new SS supply lines and plastic p-traps and chrome metal escutcheon ring-plates

# Full Bath

Bathroom Plumbing:

- If flooring is being replaced, remove existing toilet, wax ring, supply line, and shut-off
- If toilet is being replaced, supply and install new Kohler Cimarron White toilet with new wax ring, bolts, Kohler white seat, SS braided supply line, and compression ¼ turn ball valve shut-off with new chrome metal escutcheon ring/plate
- Remove existing vanity and vanity top in preparation for floor removal and new installation, per the attached spreadsheet. If replacement not needed, SAVE FOR REINSTALLATION.

If Tub and Walls are being replaced:

- Remove existing tub and wall surround
- Supply and install new Swanstone Veritek 30 x 60 tub and wall system
  - Tub: BT3060010R or L
  - Walls: BA3060010
- Supply and install new ½"drywall around the new wall system and finish to a paint ready condition
- Supply and install new chrome drain and overflow
- Supply and install new Kohler shower/tub fixture with chrome trim
- Install new copper supply line from valve to shower head
- Single handle faucet cartridges must be greased VERY WELL on install.

Bathroom Flooring (If flooring is being replaced):

- Remove existing finished floor including any underlayment down to the original sub-floor
- If sub-floor has water damage and needs replacement, Maintenance must be notified before repairs are made. Remove damaged sub-floor and replace with ¾" OSB sub-floor sheeting. Additional charge will be added to invoice.
- Supply and install ¼" smooth plywood over existing sub-floor
- Supply and install Sherwin Williams glue down 16 x 16 vinyl tiles. Install new flooring according to the manufacturer's recommendations.
- Supply and install 4" almond commercial grade vinyl cove base with cove base adhesive. Use 6" cove base to cover old paint lines if necessary.
- Install new vanity and countertop, or existing if reusable, using new SS supply lines and plastic p-traps and chrome metal escutcheon ring-plates

# Electrical

Electrical in Units:

- Licensed electricians to install approved King Innovation's AlumiConn Al/Cu Wire Connectors Model # 95125 for 3 port and Model # 95025 for 2 port Wire Connectors to all Receptacles/Outlets/Light Fixtures, any area that aluminum wire connects to copper
- See list of all area's to be replaced
- Per the 2020 National Electrical Code:
    - Remove all aluminum rated switches and receptacles
    - Remove all light fixtures
    - Install Alumiconn Lugs on all devices and fixtures including outdoor fixtures
    - Install tamper resistance receptacles throughout house
    - Install GFCI on garbage disposal
    - Install two 20 Ampere breaker on kitchen circuits
    - Install GFCI on furnace circuit for condensation pump
    - Install two GFCI for laundry circuits
    - Remove all wire nuts including neutral wires and install Alumiconn
    - Remove all purple wire nuts

# HVAC

- Replace items where needed or indicated
- Install customer supplied light/exhaust fan/vent in bathrooms where indicated
- Remove and replace water shut-offs where needed or indicated
- Remove and replace gas shut-offs where needed or indicated

# A Unit - Left




| | | | |
|---|---|---|---|
| All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions. | 2020 | This is an original design andmust not be released or copied unless applicable fee has been paid or job order placed. | Designed: 2/20/2020<br>Printed: 2/24/2020 |
| A Unit Left | All | Drawing #: 1 | No Scale. |




| | | | |
|---|---|---|---|
| All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions. | 2020 | This is an original design and must not be released or copied unless applicable fee has been paid or job order placed. | Designed: 2/23/2020<br>Printed: 2/24/2020 |

| | | | |
|---|---|---|---|
| B Unit Left | All | Drawing #: 1 | No Scale. |




All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions.

2020

This is an original design and must not be released or copied unless applicable fee has been paid or job order placed.

Designed: 2/23/2020
Printed: 2/24/2020

C Unit Left | All | Drawing #: 1 | No Scale.




# E Unit - Left

| | | | |
|---|---|---|---|
| All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions. | 2020 | This is an original design andmust not be released or copied unless applicable fee has been paid or job order placed. | Designed: 2/23/2020<br>Printed: 2/24/2020 |
| E Unit Left | All | Drawing #: 1 | No Scale. |




All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions.

2020

This is an original design andmust not be released or copied unless applicable fee has been paid or job order placed.

Designed: 2/23/2020
Printed: 2/24/2020

F Unit Right | All | Drawing #: 1 | No Scale.




All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions.

2020

This is an original design and must not be released or copied unless applicable fee has been paid or job order placed.

Designed: 2/23/2020
Printed: 2/24/2020

| | | | |
|---|---|---|---|
| H Unit Left | All | Drawing #: 1 | No Scale. |




All dimensions size designations given are subject to verification on job site and adjustment to fit job conditions.

2020

This is an original design and must not be released or copied unless applicable fee has been paid or job order placed.

Designed: 2/23/2020
Printed: 2/24/2020

I Unit Right | All | Drawing #: 1 | No Scale.

# EXHIBIT 4

March 2, 2022

Dino DeMare
PPS of Michigan, LLC
30300 Telegraph Road, Suite 205
Bingham Farms, MI 48025
DDemare@ppscoop.com

Elcine Kirkendolph
Lancaster Village Townhomes Cooperative
633 Palmer
Pontiac, MI 48342
Lancaster.sitemanager@gmail.com

***Re : Lancaster Cooperative Directives***

Dear Mr. DeMare & Ms. Kirkendolph,

We have pending issues at Lancaster that need your immediate attention. Accordingly, please regard this letter to be directives from the Board of Directors under its legal authority and act accordingly.

As you are aware, there are three units that have mold and require some form of mold remediation before the member and her family can move back or re-locate to other available units. In particular, Ms. Teonia Jackson, who has been staying at a motel and has questions and concerns regarding loss of her personal belongings and when she can move to an available unit. Mold testing confirms there is a problem, and we are all aware of this contamination. She claims no one is responding to her numerous requests for answers and assistance. She has forwarded emails verifying same.

Likewise, we have been informed that these members have made complaints to the City of Pontiac for additional assistance in making their units habitable and registering formal complaints about the existence of mold in the units. This is a terrible situation and should not have reached this level.

Directive 1: We need you to respond to each and every one of these members by the close of business tomorrow in writing, with copies sent electronically to each Board Member and the Cooperative Attorney Mr. Pentiuk.

Directive 2: We also need to have your written formal plan for mold remediation in each of these units by the close of business on Monday March 7, 2022. The members deserve to know exactly what will be done to make them whole: treatment of units and possessions, replacement of possessions, relocation of living space or any other resolution. This plan is to be shared with the members of these units and a copy sent to the Board Members and Mr. Pentiuk.

Directive 3: Engaging licensed mold expertise to guide the Cooperative through the testing and remediation is essential. Please furnish the credentials of any such expert that is currently being utilized, any contract that has been signed with them, along with any

written reports or test results produced thus far, as part of the written formal plan referenced in Directive 2.

Thank you for your cooperation and assistance in this matter.

Very truly yours,

Michael Adams

Michael Adams
Board President

Copy to Board of Directors,
Cooperative Attorney Pentiuk

# EXHIBIT 5

# Michigan Multifamily Asset Managers

2395 Jolly Road, Suite 180 Okemos MI 48864

Main Office: (517) 267-9277
Residential Inquiry:(517) 267-9905
Fax: (877) 807-2021

**TRANSMITTAL FORM**

**TO**

Esther Thomas, Executive Vice President
Professional Property Services

Phone: 248-644-4650

Fax: 248-644-4695

**FROM**

Monica Bigelow
**MMAM**

Phone: 517-267-9277 ext. 245
Fax: (877) 807-2021
Date Sent: 3/22/22
Time Sent:

**Lancaster Village Coop 1**

**Message**

Michigan Multifamily Asset Managers (MMAM) received an inquiry on March 22, 2022, from [redacted] regarding her kitchen cabinets and floor.

[redacted] alleges she has been waiting for 3-years to have the kitchen cabinets and floor replaced. The floor is yellow and rotting near the door. [redacted] further alleges she has followed up with management on several occasions and continues to receive no response or update.

MMAM requests that you review these concerns and provide a written response including supporting documentation no late than 03/24/2022. [redacted]

Sincerely,
Monica Bigelow
Manager of Resident Inquiries
monica.bigelow@mamhousing.com

CC:
Ms. Kirkendolph
Mike Adams
File

# EXHIBIT 6

written reports or test results produced thus far, as part of the written formal plan referenced in Directive 2.

Thank you for your cooperation and assistance in this matter.

Very truly yours,

Michael Adams

Michael Adams
Board President

Copy to Board of Directors,
Cooperative Attorney Pentiuk

[redacted]

---

[redacted]

[redacted]

[redacted]

---

**From:** Dino Demare <ddemare@ppscoop.com>
**Sent:** Monday, April 4, 2022 3:07 PM
**To:** Randall Pentiuk <rpentiuk@pck law.com>
**Cc:** Elcine Kirkendolph <lancasterleasingagent@gmail.com>; Esther Thomas <ethomas@ppscoop.com>
**Subject:** FW: Lancaster Village Resident Inquiry S. Amerson

We are in need of a floor replacement as a result of a MMAM inquiry. I know we are not supposed to spend money without prior authorization so we are requesting this authorization.

**Dino DeMare, President**
PPS of Michigan, LLC
30300 Telegraph Road, Suite # 205
Bingham Farms, MI 48025
Phone - 248.644.4650
Fax - 248.644.4695

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT 7

[redacted]

[redacted]

[redacted]

From: Dino Demare <ddemare@ppscoop.com>
Sent: Wednesday, March 23, 2022 11:39 AM
To: Randall Pentiuk <rpentiuk@pck-law.com>
Subject: RE: Lancaster

[redacted]

In addition, I want the Contractors that I brought in paid in full. Redford Cement and D.A. Home Improvement went out of their way and moved their schedule to complete this projected in accordance with the commitment we made to HUD with our refinancing. I don't want to see them screwed because the BOD has a bug in their ass about PPS. I am sure you will be getting pressure from the mortgage company as well since one lien has already been filed. Any issue the BOD has with D.A.'s other work that they have already been paid for they agreed to address these items under their warranty.

Dino DeMare, President

PPS of Michigan, LLC

30300 Telegraph Road, Suite # 205

Bingham Farms, MI 48025

Phone - 248.644.4650

Fax - 248.644.4695

# EXHIBIT 8

[redacted]

From: Dino Demare <ddemare@ppscoop.com>
Sent: Tuesday, April 5, 2022 2:35 PM
To: Randall Pentiuk <rpentiuk@pck-law.com>
Cc: Esther Thomas <estherpps@comcast.net>
Subject: Fwd: Lancaster

We can agree to sign the attached release once the claims for DA and Redford Cement are settled.

Dino DeMare

Sent from my iPhone

[redacted]